**Jenny Lisette FLORES, et al.,
Plaintiffs,**

v.

**Edwin MEESE, Immigration and Naturalization Service, Harold W. Ezell,
Defendants.**

**No. CV 85–4544–RJK.**

United States District Court,
C.D. California.

March 7, 1988.

Nat. Center for Immigrants' Rights, Inc., Carlos Holguin, Peter A. Schey, Los Angeles, Cal., Nat. Center for Youth Law, James Morales, Alice Bussiere, Teresa Demchak, San Francisco, Cal., ACLU Foundation of Southern California, Paul Hoffman, John Hagar, Los Angeles, Cal., for plaintiffs.

Robert C. Bonner, U.S. Atty., Frederick M. Brosio, Jr., Asst. U.S. Atty., Chief, Civil Div., Ian Fan, Asst. U.S. Atty., Los Angeles, Cal., for defendants.

## MEMORANDUM OF DECISION AND ORDER

KELLEHER, Senior District Judge.

The sole issue before the Court is whether the policy of the Immigration & Naturalization Service ("INS") to strip search all juvenile aliens upon their admission to INS detention facilities, and following all visits with persons other than their attorneys, is permissible under the Fourth Amendment of the United States Constitution.

Plaintiffs are a class consisting of all persons under the age of eighteen years who have been, are, or will be apprehended and detained pursuant to 8 U.S.C. § 1252[1] by the INS within the INS's Western Region and who have been, are, or will be subjected to, *inter alia*, a strip or body cavity search upon admission to an INS detention facility, after meeting with persons other than their attorneys, or at any other time or occasion absent demonstrable adequate cause.

Defendants are the United States Attorney General, the INS, and the Western Regional Commissioner of the INS.

Both sides have filed motions for summary judgment, agreeing that there are no material facts in dispute. Under Fed.R. Civ.P. Rule 56(c), summary judgment is appropriate where, as here, the pleadings, briefs and documentary evidence before the Court demonstrate that no genuine issue of material fact remains in dispute and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2520, 91 L.Ed.2d 202 (1986).

The Court has considered all papers and pleadings on file, the arguments of counsel, and the governing law and has determined that plaintiffs' motion for summary judgment should be GRANTED and that defendants' motion for summary judgment should be DENIED.

1. 8 U.S.C. § 1252 provides for the apprehension and detention of aliens pending the resolution of deportation proceedings. It is not a criminal statute.

## FACTUAL BACKGROUND

Presently, juvenile aliens are detained in three sectors of the INS's Western Region: Los Angeles, San Diego, and El Centro.

With respect to the Los Angeles sector, because of its distance from the Mexican border—where the overwhelming majority of plaintiffs enter the United States—juvenile aliens are rarely apprehended, and those who are detained are rarely strip searched. This differs from the policy in force at the border sectors of San Diego and El Centro.

With respect to the San Diego sector, juvenile aliens who are detained are typically apprehended by Border Patrol officers. Upon apprehension, they are given a pat-down search for weapons or contraband. They are then processed at local Border Patrol stations. If the INS decides to detain an alien, he or she is next taken to a Border Patrol staging facility. Here, all aliens, including juveniles, are strip searched. A visual search is conducted of the body, and the clothing of the alien is searched by hand.

Approximately 230 aliens are admitted and searched at the San Diego facility on a daily basis, of whom approximately twenty are juveniles. In 1987, out of approximately 84,000 aliens searched, they were twenty incidents of weapon or contraband discovery. Only four of these incidents relate to juveniles, and, of these, only one involved an item recovered in a strip search.

With respect to the El Centro sector, aliens are processed and searched in much the same way. However, after the pat-down search and processing, not all juveniles are strip searched. Detained juvenile aliens are taken to either of two facilities, of which only one facility conducts strip searches.[2]

The El Centro sector averages approximately ten juvenile aliens in detention during any given month. There is no evidence before the Court of weapon or contraband

2. Juvenile aliens are strip searched at the Imperial County Juvenile Hall but are not strip searched at the Eclectic Communication, Inc. facility in Imperial, California.

discovery, whether from juvenile or adult aliens.

In addition, all juvenile aliens detained in the INS's Western Region are strip searched after visits with persons other than their attorneys. Strip searches are conducted at other times only when there is reasonable suspicion that such search may discover weapons or contraband.

## DISCUSSION

■ Plaintiffs contend that defendants' policy of routinely strip searching detained juvenile aliens violates the Fourth Amendment of the United States Constitution, which provides, in pertinent part:

The right of the people to be secured in their persons ... against unreasonable searches and seizures, shall not be violated....

Because the prohibition announced by the Fourth Amendment extends to "unreasonable" searches, our task is to decide whether defendants' strip search policy is unreasonable under established Fourth Amendment principles.[3] This particular situation, juveniles being detained and routinely strip searched by Immigration authorities, has never been addressed by the courts.

The starting point of our analysis is *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). *Bell* dictates that any analysis concerning the reasonableness of a strip search policy in a detention facility requires a case-by-case "balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it was conducted, the justification for initiating it, and the place in which it was conducted." *Bell,* 441 U.S. at 559, 99 S.Ct. at 1884, 60 L.Ed.2d at 481.

The more intrusive the search, the more justification for the search must come. *Terry v. Ohio,* 392 U.S. 1, 18 n. 15, 88 S.Ct. 1868, 1878, n. 15, 20 L.Ed.2d 889 (1968). It is axiomatic that a strip search entails perhaps the most severe intrusion upon per-

sonal rights. Thus, a strip search policy "instinctively gives us the most pause." *Bell,* 441 U.S. at 558, 99 S.Ct. at 1884, 60 L.Ed.2d at 492; *cf. Mary Beth G. v. City of Chicago,* 723 F.2d 1263, 1272 (7th Cir.1983) (describing strip searches as "demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying degradation and submission.").

That plaintiffs are children under the age of eighteen is also a factor we must consider. Children are especially susceptible to possible traumas from strip searches. As the Supreme Court has noted, "[y]outh is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage." *Eddings v. Oklahoma,* 455 U.S. 104, 115, 102 S.Ct. 869, 877, 71 L.Ed.2d 1 (1982). It follows that a nude search of a child is an invasion of constitutional rights of some magnitude. *See, e.g., Doe v. Renfroe,* 631 F.2d 91, 92–93 (7th Cir.1980), *cert. denied,* 451 U.S. 1022, 101 S.Ct. 3015, 69 L.Ed.2d 395 (1981).

Against this invasion of personal privacy we must balance the governmental interest in conducting the particular strip searches in question. The governmental interest alleged by defendants to justify their strip search policy is the need to maintain security in detention facilities by preventing aliens from bringing in weapons or contraband; the need is apparently felt to be so great that juvenile aliens are routinely strip searched even when there is no reason to believe they are hiding weapons or contraband on their persons.

The evidence defendants offer to demonstrate the need for requiring routine strip searches of juveniles to maintain security, however, belies its purported purpose. There is no evidence whatsoever of any weapons or contraband being discovered at facilities in the Los Angeles and El Centro sectors. And the evidence from the San Diego sector is minimal. Approximately

---

**3.** The Fourth Amendment's protections extend to undocumented aliens. *Plyler v. Doe,* 457 U.S.

202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982).

230 aliens are strip searched daily at the San Diego facility—in other words, approximately 84,000 per year. In 1987, there were only twenty incidents of weapon or contraband discovery. Confining our analysis to juvenile aliens, there are approximately twenty juveniles strip searched daily, or approximately 7,300 per year. In 1987, only four instances of juveniles found with weapons or contraband were reported, and, of these, only one involved an item recovered in a strip search.[4] The other three instances involve items recovered through less intrusive means. Indeed, of the twenty instances of weapon or contraband discovery involving *all* aliens, juvenile or adult, many reports include pocket knives and other items found in baggage, through pat-down searches, and items voluntarily removed from the pockets.

*Bell* and its progeny do not lend much support to defendants' position either. *Bell*, while upholding a strip search involved adults charged with serious crimes who were detained in the Metropolitan Correctional Center in New York City, at the time a facility fraught with security dangers. Here, in contrast to adults charged with criminal offenses indicating a propensity to conceal dangerous contraband, we are concerned with children suspected of violating the immigration laws. And the facilities in which these children are housed have not been host to the security problems present in *Bell*.

Applying *Bell* to a situation more analogous to this case, the Ninth Circuit has found that a county jail's policy of routinely strip searching individuals arrested for minor offenses violated their constitutional rights. *Giles v. Ackerman*, 746 F.2d 614 (9th Cir.1984), *cert. denied*, 471 U.S. 1053, 105 S.Ct. 2114, 85 L.Ed.2d 479 (1985). In *Giles*, the court held that arrestees charged with minor offenses could be strip searched "only if jail officials possess a reasonable suspicion that the particular arrestee is carrying a concealed weapon or contraband or suffering from a communicable disease." *Id.* at 617; *accord, Ward v. Coun-*

*ty of San Diego*, 791 F.2d 1329 (9th Cir. 1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 3263, 97 L.Ed.2d 762 (1987).

Similarly, numerous courts in other circuits have struck down policies authorizing routine strip searches of minor offenders. *E.g., Mary Beth G. v. City of Chicago*, 723 F.2d 1263 (7th Cir.1983) (strip searches of confined misdemeanor offenders unreasonable unless authorities have reasonable suspicion that the individual is concealing contraband on his person); *Stewart v. Lubbock County, Texas*, 767 F.2d 153 (5th Cir. 1985), *cert. denied*, 475 U.S. 1066, 106 S.Ct. 1378, 89 L.Ed.2d 604 (1986) (strip search unlawful where no reasonable suspicion that minor offenders as a class or individually possess weapons or contraband); *Logan v. Shealy*, 660 F.2d 1007 (4th Cir.1981), *cert. denied*, 455 U.S. 942, 102 S.Ct. 1435, 71 L.Ed.2d 653 (1982) (strip search of arrested drunk driver unreasonable; offense not associated with possession of weapons or contraband and no cause to believe arrestee possessed either).

In all of these cases, policies authorizing routine strip searches of adults charged with minor offenses were found constitutionally repugnant. Certainly, application of such policies to children, who have not been charged with any criminal offense, is even more so. Children confined by the INS are not charged with any criminal offense, let alone an offense that might indicate a propensity to conceal weapons or contraband on their persons.

Defendants nonetheless argue that the present case calls for a different analysis. Defendants claim that because the vast majority of the plaintiff class are from Central American countries where they may have had little or no rights analogous to those afforded under our Constitution, they carry no actual or subjective expectation that they would not be subjected to unreasonable intrusions into their privacy when they enter the United States. We disagree. It is true that many of these plaintiffs may come from unfortunate situations where their lives and liberties had

---

**4.** The item recovered was a piece of a broken mirror. There is no indication that the teenage girl from whom it was recovered intended to use it as a weapon.

little protection. However, they have come to the United States by more than mere happenstance. Many carry with them the expectation of liberty, opportunity, and a better life, the embodiment of which is our Constitution. They have reason to expect its protections. Strip search cases at the border emphasize this point. Although Fourth Amendment rights at the border may at times be necessarily less, because of the intrusive nature of a strip search, a rather strictly applied standard of reasonable suspicion must be satisfied to justify a strip search at the border. *Kirkpatrick v. City of Los Angeles,* 803 F.2d 485, 489 (9th Cir.1986); *United States v. Handy,* 788 F.2d 1419, 1420–21 (9th Cir.1986).

 Defendants also argue that because of the number of aliens they detain, they cannot conduct strip searches based upon an objective standard such as reasonable suspicion. In so stating, defendants seek to place themselves outside the Supreme Court's express regulation of this area. The facts upon which a strip search is based *must* be capable of measurement against some objective standard. *Delaware v. Prouse,* 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979).

Defendants remain free to enhance their security by implementation of procedures less intrusive than strip searches, including the use of pat-down searches and metal detectors. *See Giles v. Ackerman,* 746 F.2d at 618. Defendants' concerns about plaintiffs' numerosity seem disingenuous when one considers that, on average, they process perhaps 230 aliens on any given day, including twenty juvenile aliens. An airport departure gate may screen the same number of persons through metal detectors and personal observation in a fraction of an hour.

Defendants also submit that if the Court invalidates its strip search policy as to juveniles, then adults will use juveniles as couriers for weapons and contraband. This point is not lightly taken. However, again the evidence belies defendants' contention. Out of approximately 84,000 aliens detained in 1987, there were only a handful of incidents involving weapons or contraband.

Moreover, defendants' contention is far too speculative for this Court to turn against a strong tide of constitutional law. If defendants' speculation ever became a statistical certainty, then perhaps the balancing test mandated by *Bell* would yield a different result than that which we reach today.

 As it is, defendants have failed to establish a plausible, much less compelling, need to routinely strip search detained juveniles. Following *Bell,* we find the INS policy of routinely strip searching juveniles upon their admission to INS facilities, and after all visits with persons other than their attorneys, violates the Fourth Amendment. Absent a reasonable suspicion that a strip search of a particular juvenile will yield weapons or contraband, such search will be unconstitutional. Thus, plaintiffs' motion for summary judgment is GRANTED, and defendants' motion for summary judgment is DENIED.