Charles **JUSTICE**, as Next Friend of James Justice, Keith Simon as Next Friend of Lazena Simon, Plaintiffs–Appellants,

v.

**CITY OF PEACHTREE CITY, Keith Dryden, Individually and in his Capacity as a Police Officer, Chris Matson, Individually and in his Capacity as a Police Officer, Defendants–Appellees.**

No. 91–8427.

United States Court of Appeals, Eleventh Circuit.

May 14, 1992.

James Edward Bischoff, Bischoff & White, Fayetteville, Ga., for plaintiffs-appellants.

Asa Mitchell Powell, Jr., Sanders, Mottola, Haugen & Mann, Newnan, Ga., for defendants-appellees.

Before HATCHETT and DUBINA, Circuit Judges, and GODBOLD, Senior Circuit Judge.

HATCHETT, Circuit Judge:

In this case which presents an issue of first impression, we hold that law enforcement officers may subject a juvenile who is lawfully in custody to a strip search based upon reasonable suspicion that the juvenile is concealing a weapon or contraband, when the strip search is conducted in the least intrusive manner, even where the juvenile is in custody after being arrested for an offense that is not a felony. In so holding, we affirm the district court.

## I. FACTS

Before February 8, 1989, the Peachtree City, Georgia Council and its mayor, Fred Brown, enacted a drug and alcohol abuse plan which the Peachtree City Manager, the Chief of Police, and the Mayor of Peachtree City developed. The plan provided for increased vehicle stops with emphasis on teenage drug offenders. At the city council meeting where Mayor Brown announced the plan, he stated: "[W]e will take whatever steps are necessary to obtain the desired results. We undoubtedly will inconvenience many law abiding citizens."

At approximately 1:30 p.m. on February 8, 1989, Officer Chris Matson of the Peachtree City Police Department observed two cars parked in an otherwise empty parking lot behind a church. Matson turned his car into the church parking lot to investigate, and as he did so the cars attempted to leave. Recognizing that one of the cars belonged to James Justice, a sixteen-year-old teenager, Matson stopped Justice's car, and upon approaching it, saw Justice give something to the only other occupant in the car, Lazena Simon, a fourteen year old girl.

When Matson asked Justice and Simon why they were not in school, they replied that they had their parents' permission to be absent from school. Matson also inquired as to why Justice and Simon were parked in the back of the church parking lot. Justice, a member of the church, informed Matson that he was in the church's parking lot because he had stopped to check a loose tire which the driver of the other recently departed car had told him about. After hearing this explanation, Matson examined the tire, and it appeared that the tire had not been handled recently. Matson radioed his headquarters and arranged for Juvenile Officer Keith Dryden to come to the church parking lot. After arriving at the parking lot, Dryden radioed Justice and Simon's high school, and school authorities informed Dryden that Justice and Simon had told school authorities they were absent due to illness. Dryden radioed the police station and requested that a police officer contact Justice's and Simon's

parents and tell the parents to pick up their children at the police station.

After Matson and Dryden informed the teenagers that they were under arrest for loitering and truancy, Matson conducted a pat-down search of Justice and placed him in the back seat of the patrol car. Additionally, Matson arranged to have Justice's car impounded, towed to the police station, and inventoried. Although Matson searched Simon's purse, neither Matson nor Dryden conducted a pat-down search of Simon before taking her to the police station. The parking lot searches did not produce any incriminating evidence.

After arriving at the police station, Dryden requested two female police officers to strip search Simon. Although Simon's mother had arrived at the police station before the strip search, the officers kept Simon from her mother. After carrying Simon to a room where no persons were present, the officers ordered Simon to strip down to her panties. Simon complied with the officers' instructions. The officers found no contraband, and released Simon into her mother's custody. The charges of loitering and truancy were later dismissed "in the best interest of justice."

On June 12, 1989, Charles Justice, as next friend of James Justice, and Keith Simon, as next friend of Lazena Simon, filed suit against Peachtree City, Keith Dryden, and Chris Matson in their individual and official capacities (the "Peachtree group"). The complaint alleged violations of 42 U.S.C. § 1983 and sought compensatory and punitive damages. Justice alleged that Matson and Dryden violated his constitutional rights when they arrested him, searched him, and impounded and inventoried his car. Simon alleged that Matson and Dryden violated her constitutional rights when they arrested her and ordered that she be stripped searched. Additionally, Justice and Simon alleged that Peachtree City, violated their constitutional rights when it adopted a policy that caused the deprivation of their constitutional rights.

The Peachtree group moved for summary judgment arguing that: (1) its actions did not violate Justice or Simon's constitutional rights; (2) the city did not have a policy, custom, or ordinance that caused a deprivation of rights; (3) qualified immunity protected Dryden and Matson; and (4) it cannot be liable for punitive damages because Matson and Dryden's conduct did not rise to the level of calloused indifference to constitutional rights. The district court granted summary judgment for the Peachtree group on all issues, except the Peachtree group's motion on the issue of whether Simon suffered compensatory damages arising out of the strip search. The district court heard this final issue on March 26, 1991, and ruled for the Peachtree group.

## II. ISSUES

On appeal, Justice and Simon present the following issues: (1) whether the district court erred in ruling that the strip search was reasonable; (2) whether the district court properly ruled that the police officers did not violate Simon and Justice's clearly established constitutional rights; and (3) whether the district court properly granted the motion for summary judgment on the issue of the Peachtree group's liability for punitive damages.

## III. CONTENTIONS

The Peachtree group contends that Simon's strip search was constitutionally permissible because the police officers possessed a reasonable suspicion that Simon was concealing contraband. Additionally, the Peachtree group contends that the manner in which they conducted the strip search, the justification for initiating it, the place in which they conducted it, and the limited scope of the intrusion supports their contention that the strip search was constitutional. The Peachtree group also contends that Simon failed to prove that the police officers' actions were pursuant to a policy or custom requiring the strip searching of juvenile females charged with truancy and loitering. The Peachtree group contends that the district court properly granted the motion for summary judgment because Officers Dryden and Matson acted in good faith and did not violate the

juveniles' clearly established constitutional rights. Thus, the officers are entitled to qualified immunity. In addition, the Peachtree group contends that the Supreme Court limited a city's liability under 42 U.S.C. § 1983 to compensatory damages.

Simon argues that the district court erred in failing to rule that the strip search was *per se* unreasonable and violative of the Fourth Amendment. She emphasizes that the officers lacked probable cause to conduct a strip search, and the circumstances surrounding the strip search did not fit into an established exception to the warrant requirement. Specifically, Simon argues that because she is a juvenile arrested for minor offenses, she could have only been subjected to a strip search if the officers had probable cause to believe she was concealing weapons or contraband which posed a threat to the safety and security of the jail.

## IV. DISCUSSION

The Fourth Amendment of the United States Constitution provides, in pertinent part: "The right of the people to be secured in their persons ... against unreasonable searches and seizures, shall not be violated...." U.S. Const. amend. IV. The Supreme Court, in interpreting the Fourth Amendment, has held that "wherever an individual may harbor a reasonable 'expectation of privacy' [the Fourth Amendment entitles the person] to be free from unreasonable governmental intrusion." *Terry v. Ohio*, 392 U.S. 1, 9, 88 S.Ct. 1868, 1873, 20 L.Ed.2d 889 (1968). The Supreme Court recognized in *Terry v. Ohio* that "the specific content and incidents of this [Fourth Amendment] right must be shaped by the context in which it is asserted. For 'what the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures.'" *Terry*, 392 U.S. at 9, 88 S.Ct. at 1873 (quoting *Elkins v. United States*, 364 U.S. 206, 222, 80 S.Ct. 1437, 1446, 4 L.Ed.2d 1669 (1960)). Thus, the Fourth Amendment is violated when the government conducts an unreasonable search in an area where a person has a reasonable expectation of privacy.

## V. CONSTITUTIONALITY

We accept as axiomatic the principle that people harbor a reasonable expectation of privacy in their "private parts." In *Doe v. Calumet City, Illinois*, 754 F.Supp. 1211 (N.D.Ill.1990), the court recognized that "[d]eeply imbedded in our culture ... is the belief that people have a reasonable expectation not to be unclothed involuntarily, to be observed unclothed or to have their 'private' parts observed or touched by others." *Doe*, 754 F.Supp. at 1218. In this case, officers ordered Simon, a fourteen-year-old girl, to remove her outer garments, expose her breasts, and stand before them clad only in her panties.

To begin our analysis, we assume that Simon was lawfully in the custody of the officers at the police station. With that assumption, we direct our attention to *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). In *Bell* the Supreme Court considered the "reasonableness" of strip searches incident to the incarceration of persons awaiting trial, sentencing, or transportation to federal prisons. In *Bell*, the individuals at the short-term custodial facility challenged the institution's practice of forcing them to submit to routine strip searches with visual body cavity inspections after each contact visit with a person from outside the institution.

The Supreme Court held that "convicted prisoners [or pretrial detainees] do not forfeit all constitutional protections by reason of their ... confinement." *Bell*, 441 U.S. at 545, 99 S.Ct. at 1877. After announcing this principle, the Supreme Court stated:

> 'Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.' ...
>
> [M]aintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees.

*Bell*, 441 U.S. at 545–546, 99 S.Ct. at 1877–78 (citations omitted) (quoting *Price v.*

*Johnston,* 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948)). The Supreme Court concluded in *Bell* that strip searches were not *per se* unreasonable and could be performed in conformity with the Fourth Amendment on less than probable cause in some instances. *See Bell,* 441 U.S. at 559–560, 99 S.Ct. at 1884–85. In order to determine the reasonableness of the search and the instances requiring less than probable cause, the Supreme Court set out the following test:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

*Bell,* 441 U.S. at 559, 99 S.Ct. at 1884.

The *Bell* balancing test for reasonableness requires "at a minimum, that the facts upon which an intrusion is based be capable of measurement against 'an objective standard,' whether this be probable cause or a less stringent test." *Mary Beth G. v. City of Chicago,* 723 F.2d 1263, 1273 (7th Cir. 1983) (quoting *Delaware v. Prouse,* 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979) (footnotes omitted)). Courts which have considered the strip search issue have applied "objective standards" ranging from "reasonable suspicion" to "probable cause." *See, e.g., Giles v. Ackerman,* 746 F.2d 614 (9th Cir.1984) (holding that arrestees for minor offenses may be subjected to a strip search only if jail officials have reasonable suspicion to believe that arrestees are concealing weapons or contraband), *cert. denied,* 471 U.S. 1053, 105 S.Ct. 2114, 85 L.Ed.2d 479 (1985); *Tinetti v. Wittke,* 620 F.2d 160 (7th Cir. 1980), *aff'g,* 479 F.Supp. 486 (E.D.Wis.1979) (holding that arrestees for minor offenses may be subjected to a strip search only if jail officials have probable cause to believe that arrestees are concealing weapons or contraband). Courts considering the strip search issue have also recognized that the

more intrusive a search is upon personal rights, the more the government must demonstrate justification for conducting the search. *See, e.g., Mary Beth G.,* 723 F.2d at 1273; *Flores v. Meese,* 681 F.Supp. 665, 667 (C.D.Cal.1988), *aff'd,* 942 F.2d 1352 (9th Cir.1991) (en banc), *cert. granted,* —— U.S. ——, 112 S.Ct. 1261, 117 L.Ed.2d 490 (1992). Thus, our application of the *Bell* balancing test must begin with consideration of the scope of the search and how much it intruded upon privacy.

It is axiomatic that a strip search represents a serious intrusion upon personal rights. In *Mary Beth G.,* the court referred to strip searches as "demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying degradation and submission." *Mary Beth G.,* 723 F.2d at 1272. Another court described the indignity individuals arrested for minor offenses experience in the following manner:

> The experience of disrobing and exposing one's self for visual inspection by a stranger clothed with the uniform and authority of the state, in an enclosed room inside a jail, can only be seen as thoroughly degrading and frightening. Moreover, the imposition of such a search upon an individual detained for a lesser offense is quite likely to take that person by surprise, thereby exacerbating the terrifying quality of the event.

*John Does 1–100 v. Boyd,* 613 F.Supp. 1514, 1522 (D.C.Minn.1985). One commentator has gone so far as to describe strip searches as "visual rape." *See* Shuldiner, *Visual Rape: A Look at the Dubious Legality of Strip Searches,* 13 J. Marshall L.Rev. 278 (1980).

In this case, the individual who suffered the state's intrusion into areas of personal privacy is a juvenile. The district court noted in *Flores* that "[c]hildren are especially susceptible to possible traumas from strip searches.... '[Y]outh is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage.'" *Flores,* 681 F.Supp. at 667 (quoting *Edding v. Oklahoma,* 455 U.S.

104, 115, 102 S.Ct. 869, 877, 71 L.Ed.2d 1 (1982)). In *Doe v. Renfrow*, 631 F.2d 91 (7th Cir.1980) (per curiam), *cert. denied*, 451 U.S. 1022, 101 S.Ct. 3015, 69 L.Ed.2d 395 (1981), the Seventh Circuit Court of Appeals held that the strip search of a thirteen-year-old female without "reasonable cause" to believe she possessed contraband on her person constituted an "invasion of constitutional rights of some magnitude." *Doe*, 631 F.2d at 93. The Seventh Circuit then stated that "More than that: it is a violation of any known principle of human decency.... the conduct herein described exceeded the 'bounds of reason' by two and a half country miles." *Doe*, 631 F.2d at 93. Thus, the strip search of a juvenile based on less than probable cause "instinctively gives us the most pause." *Bell*, 441 U.S. at 558, 99 S.Ct. at 1884. Nevertheless, strip searches are valuable law enforcement tools in maintaining security and locating contraband in institutions.

■ We next examine the manner in which the officers conducted the strip search, the place in which it was conducted, and the justification for initiating it. *Bell*, 441 U.S. at 559, 99 S.Ct. at 1884. In this case, the officer took Simon to an empty room and two uniformed female officers watched her disrobe to her panties. The officers did not perform a body cavity search. The officers limited the search in the following manner: (1) having members of the same sex perform the search, (2) using a room where only the participants were present to conduct the search, and (3) limited the search to exclude body cavities. Without doubt, the officers conducted the strip search in the least intrusive manner.

Finally, we examine the officers' justification for conducting the strip search. The Supreme Court noted in *Bell* that "maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of ... detainees." *Bell*, 441 U.S. at 546, 99 S.Ct. at 1878. Due to the extremely intrusive nature of a strip search, strip searches of arrestees based on less than probable cause have only been upheld "where such searches were necessary to protect the overriding security needs of the institution—that is, where officials have a reasonable suspicion that a particular detainee harbors weapons or dangerous contraband." *Fuller v. M.G. Jewelry*, 950 F.2d 1437, 1447 (9th Cir.1991).

A detention center, police station, or jail holding cell is a place "fraught with serious security dangers." *Bell*, 441 U.S. at 559, 99 S.Ct. at 1884. These security dangers to the institution are the same whether the detainee is a juvenile or an adult. The considerations regarding contraband are the same whether the detainee is a juvenile or an adult. Likewise, we see no reason to differentiate between strip searches to discover contraband to protect the security of the institution and strip searches within the institution which may lead to contraband (drugs) to be used as evidence of a crime. The level of intrusion is the same.

■ Consequently, we hold that law enforcement officers may conduct a strip search of a juvenile in custody, even for a minor offense, based upon reasonable suspicion to believe that the juvenile is concealing weapons or contraband. Although this result troubles us, our reading of *Bell* and our inability to find any substantial difference between the security and contraband considerations as they relate to an adult and to a juvenile lawfully in custody mandate our holding.

This court has held that "it is for the court ... ultimately to resolve whether, under the facts available to a law enforcement officer, the legal standard for reasonable suspicion was met." *United States v. Glen–Archila*, 677 F.2d 809, 813–14 n. 7 (11th Cir.), *cert. denied*, 459 U.S. 874, 103 S.Ct. 165, 74 L.Ed.2d 137 (1982). We must determine whether the officers, "based on the totality of the circumstances, had a particularized and objective basis for suspecting the particular person[ ] [searched] of criminal activity." *United States v. Vargas*, 643 F.2d 296, 298 (5th Cir. Unit B 1981). The former Fifth Circuit recognized that "reasonable suspicion should be evaluated in light of the officers' training and experience and may vary according to the

degree of intrusion into privacy occasioned by the stop or search." *Vargas*, 643 F.2d at 298. Thus, we review *de novo* whether the officers in this case possessed a particularized and objective basis for suspecting Simon or hiding contraband. *See Newell v. Prudential Ins. Co. of America*, 904 F.2d 644, 649 (11th Cir.1990); *Kirkland v. National Mortgage Network, Inc.*, 884 F.2d 1367, 1370 (11th Cir.1989).

The officers in this case believed they had a reasonable suspicion for the following reasons: (1) The officers suspected that drinking and drug activity regularly occurred in the area in which they arrested the juveniles; (2) Matson saw Justice give Simon something; (3) Simon appeared extremely nervous; (4) Dryden thought that females were more likely than males to conceal contraband on their persons; (5) Simon had a friend whose mother suspected her daughter of using drugs; and (6) Dryden suspected that Simon might have contraband on her person. After reviewing the totality of the circumstances in light of what the officers believed as a result of their training and experience, we hold that the officers possessed a particularized and objective basis for suspecting Simon of hiding contraband on her person. The facts of this case gave the officers a "reasonable suspicion," and thus the search did not violate the Fourth Amendment.[1]

Because we find the search constitutional, we do not address the other issues.[2]

Accordingly, the district court is affirmed.

AFFIRMED.

---

1. We are aware that at least one state in this circuit, Florida, permits strip searches only where law enforcement officers have probable cause. Fla.Stat. § 901.211. States are free to provide its residents and visitors with more protection than the United States Constitution requires.

2. Since this is an issue of first impression in this circuit, and research has not disclosed a case directly on point, it would be difficult for a court to find that the law on this issue was clearly established.