**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 25-6634**

───────────

MARCUS C. INGRAM,

Plaintiff - Appellant,

v.

WARDEN ISRAEL HAMILTON, Warden of Keen Mountain Correctional Center; SGT. D. SQUIER, Correctional Officer at Keen Mountain Correctional Center,

Defendants - Appellees.

───────────

Appeal from the United States District Court for the Western District of Virginia, at Roanoke.  Robert S. Ballou, District Judge.  (7:23-cv-00801-RSB-PMS)

───────────

Argued:  May 5, 2026                          Decided:  June 24, 2026

───────────

Before KING, WYNN, and THACKER, Circuit Judges.

───────────

Affirmed by published opinion.  Judge Thacker wrote the opinion, in which Judge King and Judge Wynn joined.

───────────

**ARGUED:**  Seth Raven Carroll, COMMONWEALTH LAW GROUP, PLLC, Richmond, Virginia, for Appellant.  Caitlyn Breann Switzer, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellees. **ON BRIEF:**  Jason S. Miyares, Attorney General, Theophani K. Stamos, Deputy Attorney General, Richard C. Vorhis, Senior Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellees.

───────────

THACKER, Circuit Judge

Keen Mountain Correctional Center ("Keen Mountain"), a Virginia state prison, experienced a wave of near fatal drug overdoses among inmates in May and June 2023. In response, prison officials implemented a policy to strip search every inmate who accessed the facility's no contact video visitation rooms both before and after each visit. Pursuant to that policy, corrections officers strip searched Marcus Ingram ("Appellant") 26 times in the span of a single month.

Appellant sued the prison's Warden, Israel Hamilton, and the officer who conducted the majority of those searches, Sergeant Christopher Squier (together, "Appellees"), pursuant to 42 U.S.C. § 1983. Appellant alleged that the policy violated his constitutional right to be free from unreasonable searches. Appellees moved for summary judgment on the basis of qualified immunity. The district court granted that motion, reasoning that the searches were justified by the widespread problem of drug smuggling within the prison.

We assume without deciding that some of the strip searches to which Appellant was subjected lacked reasonable justification and thus ran afoul of the Fourth Amendment. But because the reasonableness of those searches was not beyond debate at the time they took place, we affirm the district court's award of qualified immunity.

2

I.

A.

Visitation Area Layout

Keen Mountain is a maximum security state prison in southwest Virginia. Within the prison is a circular area known as "Picket Control." There, inmates in general population may access prison services such as medical care, religious instruction, and visitation. An inmate is allowed into Picket Control only if he has a scheduled appointment for one of the services provided there. The inmate must schedule such an appointment in advance so that his name can be put on a list which is relayed every morning to a guard stationed at the door between the housing unit and Picket Control. When the inmate arrives at that door before his scheduled appointment, the guard checks the inmate's prison issued ID and verifies that he is on the daily appointments list. If he is, the guard escorts the inmate through Picket Control to the location where he will have his appointment.

Picket Control contains several doors that lead to other areas within the prison. Only three are relevant here. First, as noted above, is the door that divides Picket Control from the housing unit. Second is a door between Picket Control and the medical unit. Immediately inside that unit is a lobby (hereinafter, the "Medical Holding Room") where inmates can be left to await medical services located further within the medical unit. Third is a door that leads from Picket Control to the visitation unit.

Beyond the door that leads to the visitation unit is a hallway. At the far end of the hallway is the contact visitation room -- a large room where many inmates can meet in

3

person with visitors from outside the prison.  Along one of the walls in the hallway is a second door that leads to the No Contact Visitation Area.

The No Contact Visitation Area has three sections: The Shakedown Room, the Intermediate Room, and the visitation rooms.  The door from the visitation unit hallway leads into the Shakedown Room.  There, corrections officers search inmates scheduled for no contact visitation before escorting them on to the rooms where they will have their visits.  Ordinarily, these searches are conducted "random[ly] . . . based on reasonable suspicion."  D.C. Dkt. 39-3, at 24.  The searches consist of "pat-downs and frisk[s]" unless officers determine a strip search is warranted.  *Id.* at 26–29.

Only one inmate is allowed in the Shakedown Room at a time.  After officers search an inmate, an officer escorts that inmate through a second door in the Shakedown Room which leads into the Intermediate Room.  Within the Intermediate Room are seven additional doors.  One leads to a bathroom for inmates.  Another leads to a bathroom for staff, which is always locked.  Another leads back to Picket Control -- it too remains locked.  Two of the doors lead to no contact visitation rooms, in which an inmate may meet with an outside visitor separated by a transparent barrier.  The final two doors lead to video visitation rooms.

Each of the video visitation rooms is bare but for a single stool bolted to the floor and a single, small video screen secured to the wall.  Once an inmate is inside a video visitation room, prison officials can patch through a video call to the video screen so that the inmate may communicate with persons from the outside.  No visitors ever physically enter these video visitation rooms, but instead only appear on video.  And the rooms are

4

constantly monitored by video surveillance. Additionally, there are windows built into the doors to these rooms so that patrolling guards can also observe inmates during video visitations. As noted, inmates are escorted by a corrections officer into these rooms before each scheduled appointment. And the rooms are locked from the outside during those appointments. At the end of each appointment, the inmate is escorted out of the room, through Picket Control, and back to the housing unit. Notably, because inmates are individually escorted in and out of the area one at a time, no inmate ever encounters another inside the No Contact Visitation Area. Finally, an officer searches each video visitation room after each visit to ensure that no inmate has left anything behind during his call.

Sometimes, more than one inmate is scheduled for a no contact or video visit at the same time as another inmate. But as explained above, only one inmate is permitted in the Shakedown Room at a time. And inmates may not be left unsupervised anywhere in the visitation area. So, if more than one inmate arrives for no contact visitation at the same time, the escorting officer will lead one of the inmates to the Medical Holding Room to wait until the Shakedown Room is clear. In addition, if an inmate has more than one no contact or video visit scheduled within one hour, such that there is a gap between his visits, he is brought to the Medical Holding Room to await his second visit. If more than an hour will lapse between the visits, the inmate is sent back to the housing unit and must restart the process when he returns for his next visit. And if more than one inmate needs to wait at one time, the officers "try to keep them separated as best" as they can. D.C. Dkt. 39-4, at 51 (the "Squier Affidavit").

5

B.

The Strip Search Policy

In the spring of 2023, a wave of dangerous drug use hit Keen Mountain. Between May and June 2023 alone, 13 inmates experienced near fatal opioid overdoses. That summer, "intel officers" at Keen Mountain allegedly received tips from inmates as to how the drugs might be circulating within the prison. According to those informants -- whose identities and bases of knowledge do not appear in the record -- some inmates had been using the video visitation rooms to circulate contraband by leaving packages in the rooms for later users to retrieve. The intel officers relayed these tips to Warden Hamilton.

In response, in June 2023, Warden Hamilton implemented a new policy to strip search every inmate scheduled to use one of the video visitation rooms both before and after his video call. Warden Hamilton specifically instructed that each strip search would be conducted (1) by a male officer; (2) in the Shakedown Room; (3) without touching the inmate; and (4) with no other inmates present. During each strip search, the inmate would be required to strip completely and "spread his fingers, open his mouth and stick out his tongue, run his fingers through his hair, lift his arms, lift his penis, lift his testicles, and squat and cough" under a correction officer's supervision. J.A. 52.[1] Notably, the policy did not require strip searches of inmates using other services also located in the Picket Control, such as religious services or medical services. It is also unclear whether inmates

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

6

using the no contact visitation rooms just next door to the video visitation rooms were also subject to the same policy.

Appellant, who is confined at Keen Mountain, regularly used the video visitation rooms to call his wife. Thus, pursuant to this new policy, Appellant was subjected to a strip search 26 times in the span of a single month. Appellees do not claim that they had reasonable suspicion to search Appellant on any of these 26 occasions. Sergeant Squier performed most of those searches.

The policy was in effect for "approximately 30–60 days." J.A. 51. Yet, the record does not contain a single instance, either before, during, or after implementation of this policy, in which any inmate in any way associated with the video visitation rooms was ever found with contraband, was ever associated with the trade of contraband, or was found to have suffered a medical incident related to the consumption of illicit drugs. When asked in a deposition why he ultimately suspended the policy, Warden Hamilton stated simply, "I do not remember." D.C. Dkt. No. 39-3, at 18.

## C.

### The Section 1983 Lawsuit

Appellant filed a pro se complaint against Warden Hamilton and Sergeant Squier. He asserted a cause of action for violations of his Fourth and Eighth Amendment rights pursuant to Section 1983. Appellant also stated a single claim of supervisory liability as to Warden Hamilton for the allegedly unlawful actions of Sergeant Squire.

Appellees moved for summary judgment on the basis of qualified immunity. The district court granted that motion. First, the district court held that the search policy was

reasonable, and thus permissible pursuant to the Fourth Amendment.  The court gave three reasons for that holding: (1) the searches were "visual strip searches only"; (2) drug overdose was a growing problem within the prison, and inmates had historically found "very creative" ways to hide, transport, and trade narcotics; and (3) the searches took place in a "relatively private room."  J.A. 46, 54–58.  The court also held that there was no evidence of an Eighth Amendment violation because the searches appeared to have been motivated by a legitimate penological purpose, rather than to harass or intimidate inmates.  And finally, having dismissed both of Appellant's constitutional claims, the court held that there could be no supervisory liability as to Warden Hamilton, as there was no underlying wrongdoing.

This timely appeal followed.

## II.

We review a district court's summary judgment order de novo.  *Thomas v. EOTech, LLC*, 169 F.4th 259, 263 (4th Cir. 2026).  Summary judgment is appropriate if, reviewing the record and all reasonable inferences in the light most favorable to the nonmovant, there is no genuine dispute as to any material fact, such that the movant is entitled to judgment as a matter of law.  *Id.*

8

III.

The Two Step Inquiry

Appellant argues in this appeal that the district court erred in granting Appellees qualified immunity on his Fourth Amendment claim.[2]

Government officials receive qualified immunity from Section 1983 liability unless their conduct violates clearly established law. *Zorn v. Linton*, 146 S. Ct. 926, 930 (2026). A right is clearly established when it is sufficiently clear that any reasonable officer would understand that his conduct violates the rights of another. *Id.* By contrast, "[a] right is not clearly established if existing precedent does not place the constitutional question beyond debate." *Id.* (quoting *Rivas Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021) (per curiam)) (internal quotation marks omitted). Ordinarily, to conclude that a right is clearly established, courts "'need to identify a case where an officer acting under similar circumstances . . . was held to have violated' the Constitution." *Id.* (quoting *Escondido v. Emmons*, 586 U.S. 38, 43 (2019) (per curiam)). Such a case must define the right at issue with a "high degree of specificity." *Id.* (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018)). And the case establishing the right at issue must ordinarily come from the

---

[2] Appellant does not appeal the district court's dismissal of his Eighth Amendment claim.

However, Appellant argues that the district court erred in declining to extend supervisory liability to Warden Hamilton. Because we affirm the district court's grant of qualified immunity, we do not reach this issue.

9

published decisions of this court, the United States Supreme Court, or the highest court of the state in which the relevant conduct took place -- in this case, the Supreme Court of Virginia. *deWet v. Rollyson*, 157 F.4th 344, 349 (4th Cir. 2025). However, it is also sufficient to show that there is consensus among other jurisdictions as to the particular right at issue. *Case v. Beasley*, 167 F.4th 651, 662 (4th Cir. 2026).

Thus, when a district court grants a motion for qualified immunity at the summary judgment stage, our review consists of a two step inquiry. *Bolick v. Anderson*, 169 F.4th 528, 539 (4th Cir. 2026). First, in the view most generous to the non-moving party, we ask whether the government official is alleged to have violated a constitutional right. *Id.* If so, we must determine whether that right was clearly established at the time the relevant conduct took place. *Id.* The official invoking qualified immunity bears the burden to show that the right was not clearly established. *Id.* at 540. But if the government official succeeds on either question, he is entitled to qualified immunity, and we must affirm. *Id.*

## A.

### Step One: Was There a Constitutional Violation?

#### 1.

#### The *Bell* Test

The Fourth Amendment protects individuals from unreasonable searches and seizures. U.S. Const. amend. IV. Inmates are accorded limited Fourth Amendment protection because of the special security concerns associated with incarceration. *Johnson v. Robinette*, 105 F.4th 99, 113 (4th. Cir. 2024). But they nonetheless "retain an interest in some degree of bodily privacy and integrity." *Id.* (quoting *King v. Rubenstein*, 825 F.3d

10

206, 215 (4th Cir. 2016)).  Thus, the Fourth Amendment still protects prisoners from searches that are unreasonable in the specific context of the carceral environment.  *Id.*

Under our precedents, a visual strip search is considered a sexually invasive act that "constitutes an extreme intrusion upon personal privacy, as well as an offense to the dignity of the individual." *Johnson*, 105 F.4th at 113.  To determine whether such a search of an inmate is reasonable, we apply the test established in *Bell v. Wolfish*, 441 U.S. 520 (1979).  *See id.* at 114 ("To determine whether a sexually invasive search was constitutionally unreasonable, we apply the balancing test adopted by the Supreme Court in *Bell*.").  That test assesses the reasonableness of a search "in its complete context" with particular consideration of four factors: "(1) the scope of the particular intrusion; (2) the manner in which the search was conducted; (3) the justification for initiating the search; and (4) the place in which the search was performed." *Id.* (quoting *Sims*, 885 F.3d at 261).

But Appellant urges us to apply the test from *Turner v. Safley*, 482 U.S. 78 (1987), in addition to the test from *Bell*.  However, our precedent clearly states, "[t]o determine whether a [strip] search was constitutionally unreasonable, we apply the balancing test adopted by the Supreme Court in *Bell*." *Johnson*, 105 F.4th at 114.  The reason is that *Bell* enumerates the factors to consider when an inmate alleges deprivation of a negative right, such as the Fourth Amendment right to be free from unreasonable searches and seizures. *Turner*, by contrast, provides a framework for assessing the constitutionality of a policy that deprives an inmate of an affirmative right, such as the right to marry or exercise one's religion.  *See N.G. v. Connecticut*, 382 F.3d 225, 235–36 (2d Cir. 2004) (explaining that "*Turner* concerned prisoners' assertion of affirmative rights to correspond with other

11

prisoners and to marry" and that "[t]he cases on which it relied . . . concerned prisoners' assertion of [other] affirmative rights").

Moreover, Appellant asks us to apply the *Turner* test only for its first factor, which asks whether there is a "valid, rational connection" between the challenged policy and a legitimate government interest identified by the Government  *Turner*, 482 U.S. at 89–91. But that factor merely duplicates the third *Bell* factor, which assesses the justification for initiating the search.  *Bell*, 441 U.S. at 559.  As in *Turner*, if a rational justification for the policy is lacking, the resulting intrusions are unjustified.

Thus, we apply only the test announced in *Bell*.

## 2.

## Application of the *Bell* Test

Applying the *Bell* factors here and taking the record in the light most favorable to Appellant, there are many aspects of this case that call into question the constitutionality of the strip searches, and especially the second, subsequent strip searches to which Appellant and other inmates were subjected.

As to the first *Bell* factor -- the scope of the intrusion -- our case law plainly states that a sexually invasive search, such as a visual strip search, "constitutes an extreme intrusion upon personal privacy, as well as an offense to the dignity of the individual." *Johnson*, 105 F.4th at 113.  Thus, the challenged searches are extreme in scope, and the first *Bell* factor weighs strongly in favor of Appellant.

The second *Bell* factor -- the manner of the search -- weighs in favor of Appellees. Although strip searches are extremely invasive, the searches at issue involved no touching

12

or cavity searches and were conducted by officers of the same gender as Appellant. Thus, given that inmates can sometimes hide contraband on or inside their bodies, and because the contraband that inspired the policy can be hidden in such ways, these searches were conducted in a somewhat reasonable manner given their context in the carceral environment.

Going somewhat out of order, the fourth *Bell* factor -- the location of the search -- also weighs in favor of Appellees, as each of the searches was conducted in a private area -- the Shakedown Room -- outside the view of other prisoners, and in the presence of only one or two corrections officers of the same gender as Appellant.

With respect to the third *Bell* factor, "the justification for initiating the search," *Johnson*, 105 F.4th at 114, we are mindful of the problem that inspired the policy. Drug smuggling and usage allegedly surged at Keen Mountain in the period preceding the implementation of the search policy. Thirteen inmates faced life threatening drug incidents in just one 30 day period. Around the same time, some anonymous inmates, for reasons that go unexplained, alleged that these drugs were being traded through the video visitation rooms. Based solely on those anonymous, unexplained tips, Warden Hamilton decided to strip search every inmate who signed up to use a video visitation room -- and to strip search them *twice* for each video visit.

Such a policy is a rationally tenuous response to the purported underlying problem. First, there is little reason to credit the "intel" on which Warden Hamilton relied. At no point have Appellants been able to explain the basis of the tipsters' knowledge. And even before Appellants implemented the policy, there was no other evidence linking the video

13

visitation rooms to the drug smuggling problem. For example, none of the inmates who overdosed in early 2023 were linked in any way to the video visitation rooms. Nor is there any record of any inmate being found with contraband either shortly before or after using one of those rooms. Thus, the tips are uncorroborated.

Second, and relatedly, the allegation itself appears facially incredible, as even before the policy was implemented, it appears to have been nearly impossible for anyone to trade contraband through the video visitation rooms. An inmate may access a video visitation room only if scheduled for a visit. That inmate must present himself to an officer at the door between Picket Control and the housing unit. From there, he is escorted directly to the Shakedown room, then on to a video visitation room, where he is locked inside alone until his call is completed. During that call, he is monitored both through a window in the door and on a live video feed. Plus, there is nowhere to hide any contraband in the largely bare room. And after the call, the inmate is escorted directly back to the housing unit. At no point is the inmate left unsupervised with any other prisoner. And officers search each video visitation room after each use to ensure that nothing is left behind.

Thus, in part because of the already robust security measures, the strip search policy appears to have been an overreaction to the low probability that someone could manage to trade contraband through the video visitation rooms. The absence of any pre-policy connection between drug smuggling and the video visitation rooms undermines the idea that inmates were attempting to use the rooms to smuggle drugs. The failure of any officer to find any contraband pursuant to the strip search policy buttresses that conclusion.

14

However, we are cognizant that "deference must be given to the officials in charge of the [prison on matters of prison security] unless there is substantial evidence demonstrating their response to the situation is exaggerated." *Johnson*, 105 F.4th at 113 (quoting *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 566 U.S. 318, 330 (2012)). In addition, we are aware that inmates sometimes devise creative means of smuggling and trading contraband. And because an officer is entitled to qualified immunity if he succeeds on either prong of the analysis, we may decide a case based only on the second prong without regard to the first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Consequently, we assume without deciding that the challenged policy was unreasonable and therefore unconstitutional and proceed to the second prong of the analysis.

B.

Step Two: Was the Right Clearly Established?

Assuming Appellant has established a constitutional violation, we must determine whether the right at issue was clearly established at the time of the relevant conduct. *Zorn*, 146 S. Ct. at 930. Thus, we must discern whether (1) controlling case law or (2) a consensus of persuasive authorities would have put a reasonable officer in a Virginia correctional facility on notice that the strip search policy at issue in this case was unconstitutional.

1.

Controlling Case Law

As noted, *Bell v. Wolfish*, 441 U.S. 520 (1979) is the seminal case on the reasonableness of inmate strip searches. *Bell* concerned a policy at a New York state jail that subjected inmates to a visual strip search after "every contact visit with a person from outside the institution." *Bell*, 441 U.S. at 524, 558. "Corrections officials testified that visual cavity searches were necessary not only to discover but also to deter the smuggling of weapons, drugs, and other contraband into the institution." *Id.* at 558. But those officials were able to identify only one instance where contraband had been found during those searches. *Id*. The Supreme Court nonetheless held that the policy survived a facial constitutional challenge. *Id*. In its very brief reasoning, the Court noted only that (1) drug smuggling is a common problem in correctional facilities; and (2) the infrequency of actual interdiction by corrections officers was not dispositive, as it "may be more a testament to the effectiveness of this search technique as a deterrent than to any lack of interest on the part of the inmates to secrete and import such items when the opportunity arises." *Id.* at 559.

*Florence v. Board of Chosen Freeholds of County of Burlington*, 566 U.S. 318 (2012) is also applicable. There, the Supreme Court took up the constitutionality of a policy of strip searching detainees upon admission to a local jail regardless of the offense for which the detainees had been arrested. *Florence*, 566 U.S. at 323–24. The Court held that preventing the introduction of drugs, weapons, parasites, and diseases from outside the

16

jail justified a blanket policy of searching and delousing every detainee regardless of the nature of their detention. *Id.* at 330–34.

*Johnson v. Robinette*, 105 F.4th 99 (4th. Cir. 2024) is the only analogous case from this circuit. There, corrections officers repeatedly strip searched an inmate in his cell. *Johnson*, 105 F.4th at 110–11. The officers justified the searches by noting that the inmate had previously been found with alcohol in his cell, had previously made his own alcohol, and was assigned to work in the kitchen, giving him frequent access to potential contraband. *Id.* The inmate sued, alleging that the searches were unconstitutional. *Id.* at 112. We held that the risks associated with illicit alcohol production and consumption, in combination with the inmate's history of contraband possession, justified the searches at issue. *Id.* at 114–16.

None of the above cases clearly forecloses the policy at issue in this case. As a result, we hold that no precedential opinion clearly established the unreasonableness of the challenged policy.

2.

Consensus of Persuasive Authorities

We may nonetheless hold that the right is clearly established if there is a clear consensus among persuasive authorities. We thus consider the ways that our sister circuits have treated analogous cases.

*Arruda v. Fair*, 710 F.2d 886 (1st Cir. 1983) is a closely analogous case. There, an inmate challenged a prison policy of strip searching inmates in the prison's maximum security unit both before and after the inmates made escorted trips to the prison library.

17

*Arruda*, 710 F.2d at 886.  The First Circuit held that those searches, though invasive, were justified because of the acute security needs associated with maximum security prisoners. *See id.* at 887–88.

In *Skurstenis v. Jones*, the Eleventh Circuit considered whether the constitution permitted an initial, late night strip search of a misdemeanor detainee for booking purposes and a second strip search the next day to check for parasites or communicable diseases. 236 F.3d 678, 681–81 (11th Cir. 2000).  The Eleventh Circuit answered in the affirmative, reasoning that the initial search was necessary to prevent the introduction of contraband, and that the second search -- which was conducted by medical personnel, rather than corrections officers -- was necessary to ensure the health of inmates and officers.  *Id.* at 682–84.

In *Parkell v. Danberg*, 833 F.3d 313 (3d Cir. 2016), the Third Circuit considered an appeal in which an inmate claimed that he was strip searched three times each day for twelve days while being held in an isolation cell.  *Parkell*, 833 F.3d at 321.  During that time, the inmate had no contact with any person except prison nurses, who would arrive once each day to distribute medications.  *Id.*  In addition, the inmate never left his isolation cell except to shower once each week.  *Id.*  The court held that the thrice daily searches were unconstitutional.  *Id.* at 328.  It reasoned that, at most, prison officials could justify searching the inmate only after he had made contact with a nurse or a had trip to the shower, as those instances would present the only opportunities for the inmate to obtain contraband. *Id.*

18

*Bull v. City & County of San Francisco*, 595 F.3d 964 (9th Cir. 2010) is another useful opinion. That case concerned a facial challenge to the county's policy of strip searching every inmate upon their transition from booking into custodial housing. *Bull*, 595 F.3d at 966–67. In the years predating the policy, corrections officials had uncovered hundreds of dangerous drugs, weapons, and objects among inmates in custodial housing. *Id.* at 966–67. And during the searches at issue, the officers routinely found prohibited objects and substances, including weapons and drugs. *Id.* at 969. The Ninth Circuit held that the policy was not meaningfully different than the policy at issue in *Bell*, and thus that the issue was foreclosed by controlling precedent. *Id.* at 975. Thus, the right was not clearly established.

And in *N.G. v. Connecticut*, the Second Circuit considered the constitutionality of the strip search policies of three juvenile detention centers in Connecticut. 382 F.3d 225, 227 (2d Cir. 2004). The three centers shared the same policy, which required strip searches both upon each detainee's "initial intake" and upon "readmission" -- that is, after their arrival at any detention center after departure from the same or another detention center for any reason, including in the case of direct transfer between centers. *Id.* The policy also permitted a strip search based on a reasonable suspicion that a detainee was in possession of contraband. *Id.*

The Second Circuit held that the post-transfer strip searches were unreasonable. *N.G.*, 382 F.3d at 234. An important factor in the court's analysis was that the plaintiffs were minors, as "children are especially susceptible to possible traumas from strip searches." *Id.* at 233 (quoting *Flores v. Meese*, 681 F. Supp. 665, 667 (C.D. Cal. 1988)).

19

But the ultimate basis of its reasoning was that strip searches could only be justified if there was some discernable possibility that a detainee could have acquired contraband prior to the search. *Id.* at 234. As the court explained:

> [A] prior strip search and continuous custody thereafter cannot guarantee protection from subsequent access to contraband, but the State's opportunity to maintain surveillance during custody after an initial strip search, in addition to the availability of other search techniques, renders unreasonable a subsequent strip search in the absence of reasonable suspicion of possession of contraband.

*Id.*

Finally, Appellants direct us to *Franklin v. Lockhart*, 769 F.2d 509 (8th Cir. 1985). That Eighth Circuit case involved an inmate who was strip searched twice a day despite being confined to his cell. *Franklin*, 769 F.2d at 509–10. The inmate sued, alleging that the searches violated his Eighth Amendment rights, but a district court granted summary judgment to the Government. *Id.* In a very brief opinion, the Eighth Circuit held, "summary judgment without an evidentiary hearing on this claim was inappropriate," as key details of the challenged procedure were absent from the record. *Id.* at 511. Thus, *Franklin* is of little help in this case.

All told, we discern no clear consensus among the other circuits as to whether the right at issue in this case is clearly established. On the one hand, in some cases -- including the one that is most factually analogous to the case at hand, *Arruda* -- courts have reasoned that multiple strip searches may be constitutional when unique circumstances create a risk to the safety and operation of prisons, even when an inmate has not had an opportunity to obtain contraband. On the other hand, in cases such as *Parkell* and *N.G.*, courts have

20

permitted strip searches only after an inmate has had a reasonable opportunity to encounter and obtain contraband.  Thus, our sister circuits do not provide a clear answer to the question at issue in this case -- namely, whether prison officials may subject an inmate to a second, redundant strip search based solely on the anonymous tips of other inmates.

Because the alleged constitutional violation was not clearly established in this circuit or among the constellation of other circuit opinions, we must affirm the district court's grant of qualified immunity to Appellees.

IV.

For the foregoing reasons, the district court is

*AFFIRMED*.

21