**N.G. and S.G., as parents and next friends of S.C., a minor child, et al., Plaintiffs–Appellants,**

**v.**

**State of CONNECTICUT, et al., Defendants–Appellees.**

**Docket No. 02–9274.**

United States Court of Appeals, Second Circuit.

Argued: Sept. 3, 2003.

Decided: Sept. 7, 2004.

Thomas W. Kelly, Newport, RI, for Plaintiffs–Appellants.

Terrence M. O'Neill, Asst. Atty. General, Hartford, CT (Richard Blumenthal, Atty. General, Steven R. Strom, Asst. Atty. General, Hartford, CT, on the brief) for Defendants–Appellees.

Before: NEWMAN, SOTOMAYOR, and WESLEY, Circuit Judges.

Judge SOTOMAYOR concurs in part and dissents in part with a separate opinion.

JON O. NEWMAN, Circuit Judge.

This appeal concerns the lawfulness of strip searches performed upon young girls in juvenile detention centers. The parents of two female children appeal from the September 30, 2002, judgment of the District Court for the District of Connecticut (Peter C. Dorsey, District Judge), ruling that, even though Connecticut's blanket strip search policy for all those admitted to juvenile detention centers ("JDCs") violates the Fourth Amendment, the particular strip searches of their daughters, identified as S.C. and T.W., were lawful. The Appellants contend that the searches were unlawful for lack of a reasonable basis to believe either that the juveniles had done anything that would be a crime if committed by an adult or had possessed weapons or other contraband. The Appellants also seek review of the District Court's denial of their motion for class certification.

We conclude that the searches conducted upon each initial entry into the custody of the State's juvenile authorities were lawful, but that repetitive searches, conducted while the girls remained in custody, violated the Fourth Amendment in the absence of reasonable suspicion that contraband was possessed. We therefore vacate

the judgment and remand to determine what relief, if any, should be awarded.

## Background

Connecticut's judicial branch, through its Court Support Services Division ("CSSD"), operates three juvenile detention centers located in Bridgeport, Hartford, and New Haven. Connecticut also confines juveniles in other institutions with which it has contracts—the Girls Detention Center ("GDC"), operated by defendant CSI Connecticut, Inc., and Juvenile Forensic Services ("JFS"), a center operated by defendant Juvenile Forensic Services, LLP. All of these facilities, collectively referred to as "JDCs," admit thousands of juveniles annually. In Connecticut, a juvenile is either a "child," defined as "any person under sixteen years of age," Conn. Gen.Stat. § 46b–120(1) (2003), or a "youth," defined as "any person sixteen or seventeen years of age," *id.* § 46b–120(2).[1]

JDCs house juveniles detained for a wide variety of reasons, but the record is not entirely clear as to precisely what circumstances may result in confinement in JDCs. From the testimony of Judge Christine E. Keller, Chief Administrative Judge for Juvenile Matters, it appears that the principal basis for detention is to await trial following arrest for a serious juvenile offense. Upon arrest for a juvenile offense that is not serious, detention could also occur if the parents refuse to take the child back into their home and the State's Department of Children and Families cannot promptly find a bed in a suitable facility.

Another frequent basis for detention arises from a designation known as "families with service needs." Conn. Gen.Stat. § 46b–120(8). "Families with service needs" means a family that includes a child who has acted in one of five ways: (1) run away from home without just cause, (2) become beyond the control of parents, (3) engaged in indecent or immoral conduct, (4) been a truant or overtly defied school rules, or (5) if thirteen years of age or older, has engaged in sexual intercourse with a person of similar age.[2] *Id.* Judge Keller explained that detention can result upon a judge's finding that one of these five circumstances exists and that there is probable cause to believe that a delinquent act has been committed. Of these five categories, the most common are runaways and truants.

*The State policy.* Operational Policy 311 of Connecticut's Judicial Branch Division of Juvenile Detention Services ("the Policy") provides for various searches, including frisk searches, general facility searches, area searches, perimeter searches, vehicle searches, and, pertinent to this appeal, strip searches. The Policy specifies that a strip search shall be conducted upon each detainee's "initial intake" at a JDC and upon each detainee's "readmission," or after any detainee "has left the supervision of Detention Center or Judicial Branch staff (*e.g.,* a furlough or inpatient hospital admission), or an [Alternate Detention Program] resident returning to the Detention Center to attend a court hearing." The Policy also authorizes strip searches upon "reasonable belief that a detainee may be carrying dangerous contraband."[3] The Policy applies at the three

---

1. In Connecticut a "minor" is a person under the age of eighteen. Conn. Gen.Stat. § 1–1d.

2. The other person must be thirteen years of age or older and not more than two years

older or younger than the child in question. Conn. Gen.Stat. § 46b–120(8)(E).

3. The Policy defines "contraband" as "[a]nything not authorized to be in a detainee's possession, anything used in an unauthorized

state-run JDCs and the JDCs operated under state contract.

*Description of strip search.*

The Policy, as amended September 1, 2002, prescribes the following steps for a staff member conducting a strip search[4] to follow:

a. Inform the detainee of the strip search and the purpose of the search.

b. Check the detainee's ears, nose and mouth, including under the tongue.

c. Have the detainee remove and step away from clothing and shoes and put on a JDC-issued robe.

d. Have the detainee run his/her own hands through his/her hair.

e. Check the bottom of detainee's feet.

f. Have the detainee raise one arm of the robe to mid-biceps and examine top and bottom of arm and hand with fingers spread. Repeat the procedure with second arm and hand.

g. Have the detainee raise the bottom of the robe to below the crotch to expose and inspect the front of the legs and feet.

h. Have the detainee turn 180 degrees and drop the robe off the shoulders in order to inspect the upper back and shoulders.

i. Have the detainee raise the bottom of the robe to above the waist in order to inspect the buttocks and legs.

j. Have the detainee turn 180 degrees (facing staff), and drop the robe off the shoulders and open the front of the robe, exposing the entire front of the body, shoulders, and upper arms.

k. Instruct the detainee to shower and dress immediately in a clean uniform.

l. Search all clothing and personal items, and label and store them appropriately.

Prior to the September 1, 2002, revision, the Policy permitted a strip search to include a visual inspection of vaginal and anal body cavities, but the revision now specifies that "[u]nder no circumstances will visual, manual, or instrument inspection of the vaginal or anal body cavities be conducted."

*Strip searches of S.C.* S.C. has a history of mental illness, suicide attempts, self-mutilation, sexual activity with older men, drug and alcohol abuse, and drug-peddling. In July 2000, S.C., then 14 years old, was adjudicated a member of a "family with service needs" by the Superior Court as a result of her repeated failures to obey court orders requiring her to stay at home or at institutions in which she was placed.

S.C. testified, without contradiction, to having been strip searched eight times. The first occurred in July 2000 after Wallingford police arrested her for running away from home in violation of a court order and brought her to the New Haven

---

or prohibited manner; anything altered in any way or anything in excess of allowable limits."

4. "Strip search" is often used as an umbrella term that applies to all inspections of naked individuals. Various other phrases have been used depending on how the search is conducted. A "visual body-cavity search" usually means visual inspection of a naked body, including genitals and anus, without any contact. *See Security and Law Enforcement Em-*

ployees v. Carey, 737 F.2d 187, 192 (2d Cir. 1984). A "manual body-cavity search" generally means an inspection of a naked body, including genitals and anus, by means of touching or probing with an instrument. *See Blackburn v. Snow,* 771 F.2d 556, 561 n. 3 (1st Cir.1985). Unless otherwise indicated, we will use the term "strip search" to mean the type of search, without visual or manual body-cavity inspection, currently authorized by the Policy.

Juvenile Detention Center ("NHJDC"). The strip search was conducted by a female staff member upon S.C.'s admission to NHJDC. S.C. was then presented before a Superior Court Judge, who ordered her detained at the Girls Detention Center ("GDC") pending future placement. After her return from state court, she was transported from NHJDC to GDC in handcuffs and leg shackles. The second strip search occurred upon her admission to GDC. The third strip search occurred upon her return to GDC after being transported, in handcuffs and shackles, to court. S.C. was later released to her parents under a court order not to run away from home.

Four more strip searches occurred in the fall of 2000. After S.C. had violated the above-mentioned court order, her parents called the police, who took her into custody and brought her to NHJDC. Upon her admission, a staff member performed a strip search. This was her fourth strip search. She was then presented in court, and ordered detained at JFS to which she was transported in handcuffs and shackles. The fifth strip search occurred upon her admission to JFS. The sixth and seventh strip searches were performed during S.C.'s detention at JFS when institutional searches were conducted due to concern over a missing pencil. S.C. was later released to her parents.

The eighth strip search occurred in January 2001. After S.C. ran away from home again, the state court ordered her placed in Stonington Institute, a hospital, to await placement. S.C. ran away, but eventually turned herself in to the Wallingford Police Department. When the police delivered her to NHJDC, a staff member strip searched S.C. upon admission.

During the second and third searches, S.C. was instructed to squat and cough, as she explained, "to check if there is anything that might fall out of your cavities."

The record is unclear as to whether visual inspection of vaginal or anal body cavities occurred during these two searches, but this ambiguity need not be resolved because the Policy currently in effect prohibits such inspections, and, as discussed below, we conclude that these two searches were unlawful for other reasons. No contraband was found in any of the eight strip searches.

*Strip searches of T.W.* T.W. was strip searched twice. In October 2000, T.W., then a 13–year–old girl with a history of persistent truancy, and possibly mental health issues, had been adjudicated a member of a "family with service needs" due to her truancy. When she violated court orders requiring her to attend the seventh grade, the Superior Court ordered her detained at NHJDC, where a staff member strip searched her upon admission. The next day, she was transferred to GDC in handcuffs and leg shackles. Upon admission, a GDC staff member performed T.W.'s second strip search. After one week, T.W. was released to her mother.

Visual inspection of vaginal or anal body cavities was not performed during either of the two strip searches. No contraband was found in either search.

*The lawsuit.* S.C.'s and T.W.'s parents brought a suit under 42 U.S.C. § 1983 for damages and injunctive relief against the State of Connecticut as well as various directors and supervisors of CSSD, Juvenile Detention Services, NHJDC, Department of Children and Families of the State of Connecticut; CSI Connecticut, Inc., and Juvenile Forensic Services, LLP, individually and in their official capacities. The suit challenged the JDCs' policy of strip searching all admittees, regardless of the cause for admission, as violative of S.C.'s and T.W.'s Fourth Amendment protection

from unreasonable searches.[5] They sought to bring a damages suit on behalf of a class of juveniles held as members of "families with service needs," arrested for noncriminal offenses, or charged with minor offenses in Connecticut, all of whom were strip searched in the named juvenile detention facilities pursuant to the Defendants' policy.

*District Court ruling.* After denying class certification, Judge Dorsey stated that the strip search policy, applicable to all confined children in JDCs, violated the Fourth Amendment,[6] but nevertheless ruled that the strip searches of S.C. and T.W. were reasonable. He concluded that the history of both girls "suggest[ed] prospective behavior which would predispose them to bringing various contraband into a JDC." He found S.C. to be "rebellious, defiant of authority, suicidal, belligerent, promiscuous, a drug user and dealer and mentally unstable." Acknowledging that T.W.'s truancy was "a quieter rejection of authority," he nonetheless found that her bouts of depression and expression of regret at having been born created a risk of self-injury that rendered the strip searches reasonable. The complaint was ordered dismissed.

## Discussion

The Fourth Amendment prohibits "unreasonable" searches, a somewhat amorphous standard whose meaning varies with the context in which a search occurs and the circumstances of the search. In the enforcement of criminal law, a search generally requires the prior issuance of a warrant, supported by probable cause to believe that identified items will be found. *See Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 619, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989). In some circumstances a warrant is not required, but "some quantum of individualized suspicion" must be shown. *Id.* at 624, 109 S.Ct. 1402 (internal quotation marks omitted). Less intrusive "frisks" are permitted upon articulable suspicion concerning the person to be stopped and frisked. *See Terry v. Ohio,* 392 U.S. 1, 20–21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

■ Outside the law enforcement context, "in the context of safety and administrative regulations, a search unsupported by probable cause may be reasonable when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." *Board of Education v. Earls,* 536 U.S. 822, 829, 122 S.Ct. 2559, 153 L.Ed.2d 735 (2002) (internal quotation marks and citation omitted).[7] "[I]n certain limited circumstances, the Government's need to discover ... latent or hidden conditions, or to prevent their development, is sufficiently compelling to justify the intrusion on privacy entailed by conducting such searches without any measure of individualized suspicion." *Id.* (internal quotation

---

**5.** The Plaintiffs acknowledge that strip searches could lawfully be conducted upon admission of those juveniles incarcerated for offenses that would be felonies if they were adults and those reasonably suspected of possession of contraband. Otherwise, they contend that a thorough pat and frisk adequately serves the State's legitimate interests.

**6.** Despite the District Court's statement that the Policy violated the Fourth Amendment, the Court's judgment contains no declaration to that effect. The judgment states only that it is "entered for the defendants and both cases are closed." We therefore have no occasion to review any ruling with respect to the facial unlawfulness of the Policy.

**7.** The phrase "special needs," in Fourth Amendment jurisprudence, originated in Justice Blackmun's concurring opinion in *New Jersey v. T.L.O.,* 469 U.S. 325, 351, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985).

marks and citation omitted). However, the "special needs" standard does not validate searches simply because a special need exists. Instead, what is required is "a fact-specific balancing of the intrusion ... against the promotion of legitimate governmental interests." *Id.* at 830, 122 S.Ct. 2559. This is simply an application of the overarching principle that "[t]he test of reasonableness under the Fourth Amendment ... requires a balancing of the need for the particular search against the invasion of personal rights that the search entails." *Bell v. Wolfish,* 441 U.S. 520, 559, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).

These principles have been applied to permit reasonable searches, without warrants, in hospitals, *see O'Connor v. Ortega,* 480 U.S. 709, 725, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987); schools, *see New Jersey v. T.L.O.,* 469 U.S. 325, 341–43, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985); government agencies, *see National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 666–67, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989); and highly regulated industries, *see Skinner,* 489 U.S. at 633, 109 S.Ct. 1402. Pertinent to the pending case are decisions applying the "special needs" test to uphold suspicionless drug-testing (urinalysis) of middle and high school students participating in extracurricular activities, *Earls,* 536 U.S. at 828–38, 122 S.Ct. 2559, and students participating in school athletics, *see Vernonia School District 47J v. Acton,* 515 U.S. 646, 664–65, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995).

Especially pertinent to the pending case, the "special needs" standard applies to searches in penal institutions, *see Roe v. Marcotte,* 193 F.3d 72, 78 (2d Cir.1999), although the Supreme Court's first use of the standard in this context occurred before the phrase "special needs" had been coined, *see Wolfish,* 441 U.S. at 559–60, 99 S.Ct. 1861. In *Wolfish,* the Supreme Court acknowledged that when a person has been convicted and lawfully confined, constitutional protections do not cease, *see Wolfish,* 441 U.S. at 545, 99 S.Ct. 1861, but " '[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights,' " *id.* at 545–46, 99 S.Ct. 1861 (quoting *Price v. Johnston,* 334 U.S. 266, 285, 68 S.Ct. 1049, 92 L.Ed. 1356 (1948)). Subsequently, the Court formulated a variation of the "special needs" standard applicable to adjudication of constitutional claims of those lawfully confined: "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987); *see Overton v. Bazzetta,* 539 U.S. 126, 132–33, 123 S.Ct. 2162, 156 L.Ed.2d 162 (2003); *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987).

Strip searches performed on those lawfully confined have provoked considerable litigation. In *Wolfish,* the Supreme Court upheld a strip search, including visual inspection of body cavities, of sentenced prisoners and pretrial detainees, after every contact visit with a person from outside the institution.[8] 441 U.S. at 558–60,

---

**8.** The contact visit apparently provided a generalized, though not an individualized, basis for concern that the inmate might have acquired contraband. This suggests that, as to those lawfully confined, a specific basis for concern about contraband will support strip searches, even absent a basis for individualized suspicion. One Justice appears to attach

little, if any, importance to the fact that the searches in *Wolfish* were limited to inmates after contact visits. In granting a stay as Circuit Justice, then-Justice Rehnquist viewed *Wolfish* as applying Fourth Amendment standards "to the practice of conducting strip-searches of persons detained after being charged with a crime." *Clements v. Logan,*

99 S.Ct. 1861. This Court has upheld routine random strip searches, including body-cavity inspections, performed on prison inmates. *See Covino v. Patrissi,* 967 F.2d 73, 76–80 (2d Cir.1992); *see also Hurley v. Ward,* 584 F.2d 609, 612 (2d Cir. 1978) (reversing portion of injunction prohibiting strip searches of prison inmates). However, in several decisions, we have ruled that strip searches may not be performed upon adults confined after arrest for misdemeanors, in the absence of reasonable suspicion concerning possession of contraband. *See Shain v. Ellison,* 273 F.3d 56, 62–66 (2d Cir.2001); *Wachtler v. County of Herkimer,* 35 F.3d 77, 81 (2d Cir.1994); *Walsh v. Franco,* 849 F.2d 66, 68–69 (2d Cir.1988); *Weber v. Dell,* 804 F.2d 796, 802 (2d Cir.1986). *But see Shain,* 273 F.3d at 70–76 (Cabranes, J., dissenting) (contending that *Weber* had been superseded by the Supreme Court's decision in *Turner* and that this consequence should have led to upholding the strip search policies in *Shain, Wachtler,* and *Walsh*). As far as we can tell, all the circuits to have considered the issue have reached the same conclusion with respect to strip searches of adults confined for minor offenses. *See Miller v. Kennebec County,* 219 F.3d 8, 12 (1st Cir.2000) (failure to pay fine); *Logan v. Shealy,* 660 F.2d 1007, 1012–13 (4th Cir.1981) (drunk driving); *Kelly v. Foti,* 77 F.3d 819, 821–22 (5th Cir.1996) (motor vehicle violations); *Masters v. Crouch,* 872 F.2d 1248, 1253–55 (6th Cir.1989) (failure to appear for motor vehicle violation); *Mary Beth G. v. City of Chicago,* 723 F.2d 1263, 1266, 1268–73 (7th Cir.1983) (various misdemeanors); *Jones v. Edwards,* 770 F.2d 739, 740–42 (8th Cir.1985) (refusal to sign complaint for leash law violation); *Giles v. Ackerman,* 746 F.2d 614, 615–19 (9th Cir.1984) (motor vehicle violations); *Chapman v. Nichols,* 989 F.2d 393, 395–97 (10th Cir.1993) (same).

Strip searches of children pose the reasonableness inquiry in a context where both the interests supporting and opposing such searches appear to be greater than with searches of adults confined for minor offenses. Where the state is exercising some legitimate custodial authority over children, its responsibility to act in the place of parents (*in loco parentis* ) obliges it to take special care to protect those in its charge, and that protection must be concerned with dangers from others and self-inflicted harm. "Children ... are assumed to be subject to the control of their parents, and if parental control falters, the State must play its part as *parens patriae* .... In this respect, the juvenile's liberty interest may, in appropriate circumstances, be subordinated to the State's '*parens patriae* interest in preserving and promoting the welfare of the child.' " [9] *Schall v. Martin,* 467 U.S. 253, 265, 104 S.Ct. 2403, 81 L.Ed.2d 207 (1984) (quoting *Santosky v. Kramer,* 455 U.S. 745, 766, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)) (upholding pretrial detention). At the same time, the adverse psychological effect of a strip search is likely to be more severe upon a child than an adult, especially a child who has been the victim of sexual abuse.[10]

454 U.S. 1304, 1309, 102 S.Ct. 284, 70 L.Ed.2d 461 (chambers opinion), *vacated,* 454 U.S. 1117, 102 S.Ct. 961, 71 L.Ed.2d 105 (1981).

9. Although the Supreme Court used the phrase *"parens patriae,"* it appears to have been referring to the state's responsibility when acting *in loco parentis.*

10. One child psychologist, testifying at the trial, agreed that, at least "in theory," it would be traumatic for a child who had been sexually assaulted to be forced to expose her body to another individual. A recent study found that 29 percent of Connecticut's female juvenile detainees reported having been sexually abused. *See* John F. Chapman, Sherrie Wasilesky & Michael Zuccaro, "Assessment of

In the pending case, neither side has called to our attention an appellate ruling on the reasonableness of strip searches of juveniles in lawful state custody, in the absence of individualized suspicion of possession of contraband. The Seventh Circuit has ruled unreasonable school officials' strip search of a 13–year–old female student to find narcotics, in the absence of reasonable cause to believe she possessed any narcotics. *See Doe v. Renfrow,* 631 F.2d 91, 92–93 (7th Cir.1980). Unlike S.C. and T.W., the student searched in *Doe* was not confined in a detention facility. The Eleventh Circuit has upheld strip searches of incarcerated juveniles, but only upon a showing of reasonable suspicion of possession of contraband. *See Justice v. City of Peachtree City,* 961 F.2d 188, 193 (11th Cir.1992). A district court has ruled unconstitutional strip searches of detained juvenile aliens conducted by the Immigration and Naturalization Service. *See Flores v. Meese,* 681 F.Supp. 665 (C.D.Cal. 1988).

Against this background of pertinent but not precisely governing case law, we consider the claims in the pending case. Connecticut acknowledges that its strip search policy "is not related to the investigation of criminal acts," Br. for Appellees at 19, and contends that the individualized suspicion requirement associated with criminal law enforcement is therefore not applicable. Instead, the State contends that the Policy comports with the "special needs" test of *Earls* and, alternatively, is reasonably related to legitimate penological interests so as to satisfy the test of *Turner.*

In determining whether the strip searches of S.C. and T.W. violated the Fourth Amendment under the standards of either *Earls* or *Turner,* we first consider the nature of the intrusion upon the

girls' privacy. A strip search with body-cavity inspection is the practice that "instinctively" has given the Supreme Court "the most pause." *Wolfish,* 441 U.S. at 558, 99 S.Ct. 1861. The Seventh Circuit has described strip searches as "demeaning," "dehumanizing," and "terrifying." *Mary Beth G.,* 723 F.2d at 1272 (internal quotation marks omitted). The Tenth Circuit has called them "terrifying." *Chapman,* 989 F.2d at 396. The Eighth Circuit has called them "humiliating." *Hunter v. Auger,* 672 F.2d 668, 674 (8th Cir.1982). And since "youth ... is a ... condition of life when a person may be most susceptible ... to psychological damage," *Eddings v. Oklahoma,* 455 U.S. 104, 115, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), "[c]hildren are especially susceptible to possible traumas from strip searches," *Flores,* 681 F.Supp. at 667.

■ In assessing the interests served by the strip searches, we think the searches must be considered separately since the justifications are not the same for each search. The second, third, and fifth searches of S.C. and the second search of T.W. were conducted after the children's transfer from one facility to another. Upon their initial admission to a detention facility, they had been strip searched, and they remained in custody throughout the transfer process. For example, after being searched upon admission to NHJDC, S.C. was transferred to court, transferred back to NHJDC, and then transferred to GDC. There is no indication that she had any unsupervised opportunity to acquire contraband during these transfers. Whatever the justification for strip searches upon initial admission to a first detention facility, we see no state interest sufficient to warrant repeated strip searches simply

the Psychiatric Needs of Children in Connecticut's Juvenile Detention Centers: A Report to

the Deputy Chief Court Administrator's Task Force on Overcrowding" 23 (Nov. 27, 2000).

because of transfers to other facilities.[11] *See Hodges v. Stanley*, 712 F.2d 34, 35 (2d Cir.1983) (second search of administrative detainee appears to be unnecessary and unreasonable when detainee had been under continuous escort after initial search). Arguably, it was more convenient for the personnel at GDC to strip search S.C. upon her admission there, rather than determine whether she had been strip searched upon her prior admission to NHJDC and had remained in custody throughout the transfer process. Mere convenience, however, cannot be a sufficient interest to justify such a serious impairment of privacy. We recognize that unavoidable circumstances might arise, even during a period of continuous custody, that create opportunities for an inmate to acquire contraband, in which event a strip search might well be reasonable. No such circumstances were shown in this case.

Of course, a prior strip search and continuous custody thereafter cannot guarantee protection from subsequent access to contraband,[12] but the State's opportunity to maintain surveillance during custody after an initial strip search, in addition to the availability of other search techniques, renders unreasonable a subsequent strip search in the absence of reasonable suspicion of possession of contraband.

██ The sixth and seventh strip searches of S.C. occurred at JFS, prompted by the disappearance of a pencil on two separate occasions. Pencils had been handed out to a group of ten to twenty girls in a room, and one had not been returned. Since S.C. had already been strip searched upon her initial admission to JFS, a repeated search to see if S.C. had taken the missing pencil on either occasion required at least some reasonable suspicion pointing to her as the culprit. We have ruled that strip searches of those arrested for misdemeanors require reasonable suspicion of possession of contraband. *See Shain*, 273 F.3d at 62–66. Although we recognize the possibilities that a pencil could be used as a weapon and could be concealed in a body-cavity, the combination of these possibilities alone is too unlikely to justify the serious intrusion of a strip search, in the absence of reasonable suspicion concerning possession of the missing item. Such reasonable suspicion might arise if less intrusive searches such as pat-downs of the girls in the room where the pencil disappeared failed to locate it, raising suspicion that one of the girls in that room had the pencil concealed.[13]

██ With respect to the searches performed upon the girls' initial admission to

---

11. In papers submitted after oral argument in response to the Court's inquiry, the Defendants contend that strip searches are not conducted upon arrival at one institution after transfer from another institution. *See* Letter from Terrence M. O'Neill, Ass't Attorney General, to Hon. Sonia Sotomayor of Sept. 4, 2003, at 3. However, the evidence is to the contrary. The testimony the Defendants cite stated only that a search was not performed when an inmate was transferred *out* of an institution, not that there was no search upon arrival at the new institution.

12. A supervisor at JFS testified that a strip search was performed after transportation from NHJDC because it would be "foolish" to

rely on the searching at NHJDC and because contraband might have been picked up during transport or off the desk of a probation officer. One of the managers of Juvenile Forensic Services, LLP testified that an inmate of JFS once admitted that she stole a paper clip during a court appearance and used it to mutilate herself while being transported in a van back to JFS.

13. Since the pencils were numbered, it would not have been difficult to keep track of which girls had which pencils, thereby pinpointing the girl who had not turned in the missing pencil.

state custody, the issue is closer. To justify the searches under the *Turner* standard would extend that standard beyond the context in which it was established—a prison. 482 U.S. at 89, 107 S.Ct. 2254. S.C. and T.W. were confined in juvenile detention facilities. They had not been convicted of any crime, and were not confined awaiting trial on any criminal charges. On the other hand, contraband such as a knife or drugs can pose a hazard to the security of an institution and the safety of inmates whether the institution houses adults convicted of crimes or juveniles in detention centers. Yet before we can uphold a search as reasonably related to penological interests, there must be some justification for placing the person searched into the type of institution where the *Turner* standard applies. Perhaps the *Turner* standard applies to a state facility confining juveniles who have been convicted of conduct that would be a crime if committed by an adult, and, perhaps it even applies to juveniles awaiting trial for such conduct. This would be so if "penological interests" include the interests of a state in confining juveniles convicted of, or awaiting trial for, such conduct. If that is so, there would be a substantial argument that a strip search of juveniles upon their initial admission to such a facility would satisfy the *Turner* standard of being reasonably related to valid penological interests.

But it is far from clear that the *Turner* standard applies to juveniles confined for running away from home or failing to attend school, even where such conduct occurs in violation of a court order. Whatever a state's interests in confining such juveniles in order to discharge its substitute parent responsibilities, we doubt that such

confinement serves the sort of penological interests the Supreme Court had in mind in fashioning a standard applicable to adult prisons. No doubt a state has a legitimate interest in confining such juveniles in some circumstances, but it does not follow that by placing them in an institution where the state might be entitled, under *Turner*, to conduct strip searches of those convicted of adult-type crimes, a state may invoke *Turner* to justify strip searches of runaways and truants.

Moreover, there is some basis for doubting that the *Turner* standard applies to a claim of constitutional protection *from* state action such as a strip search. *Turner* concerned prisoners' assertion of affirmative rights to correspond with other prisoners and to marry. 482 U.S. at 81–82, 107 S.Ct. 2254. The cases on which it relied, *see id.* at 84–87, 107 S.Ct. 2254, concerned prisoners' assertion of affirmative rights to mail uncensored letters, *Procunier v. Martinez*, 416 U.S. 396, 407–12, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974); to media interviews, *Pell v. Procunier*, 417 U.S. 817, 821–27, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974); to organize a union, *Jones v. North Carolina Prisoners' Union, Inc.*, 433 U.S. 119, 125–27, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977); and to order books, *Wolfish*, 441 U.S. at 548–52, 99 S.Ct. 1861.[14] Significantly, one of the factors the Supreme Court identified as pertinent to the reasonableness of a challenged prison regulation was the availability of "ready alternatives" for the prisoners to exercise their rights. *Turner*, 482 U.S. at 90, 107 S.Ct. 2254. "[I]f an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court

---

**14.** Interestingly, in formulating the standard of "reasonably related to legitimate penological interests," *Turner* referred only to the *Wolfish* prisoners' affirmative claim to receive books, *see Turner*, 482 U.S. at 87, 107 S.Ct. 2254, and made no mention of their claim to be free of strip searches conducted after contact visits.

may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Id.* at 91, 107 S.Ct. 2254. The consideration of alternative ways for the prisoner to exercise affirmative rights was an understandable part of the overall "reasonableness" inquiry in *Turner* and the cases it relied on, but has doubtful relevance to a prisoner's claim to be free from a constitutionally unreasonable search.

S.C. was initially confined for violating a court order not to run away from home, and T.W. was initially confined for violating a court order to attend school. The justification for impairing their constitutional rights for such conduct under the *Turner* rationale would seem to be less substantial even than that held insufficient for adults confined after arraignment on misdemeanor charges, *see Shain,* 273 F.3d at 62–66. Although such adults have not been convicted, there was at least probable cause to believe that they had committed crimes. For all of these reasons, we doubt that the strip searches of S.C. and T.W. can be upheld under the *Turner* rationale.

For several reasons, the State makes a more substantial contention in relying on the "special needs" standard of *Earls.* First, although the age of the children renders them especially vulnerable to the distressing effects of a strip search, it also provides the State with an enhanced responsibility to take reasonable action to protect them from hazards resulting from the presence of contraband where the children are confined. The State has temporarily become the *de facto* guardian of children lawfully removed from their home, and "when the government acts as guardian ... the relevant question is whether the search is one that a reasonable guardian ... might undertake," *Vernonia,* 515 U.S. at 665, 115 S.Ct. 2386. The State has a more pervasive responsibility for children in detention centers twenty-four hours a day than for the children in *Vernonia* and *Earls* who were under State authority for the few hours of the school day. Second, a strip search serves the protective function of locating and removing concealed items that could be used for self-mutilation or even suicide.[15] Approximately one half of the girls admitted to JDCs showed signs of self-mutilation. A child psychologist testified that children often self-mutilate in part because of their inability to articulate their feelings. Third, a strip search will often disclose evidence of abuse that occurred in the home, and awareness of such abuse can assist juvenile authorities in structuring an appropriate plan of care.

The discovery-of-abuse factor raises two issues that require further consideration. The first is whether the factor may be considered at all in view of the testimony of an assistant supervisor at NHJDC that finding evidence of abuse is not one of the purposes of performing strip searches.[16] In considering the subjective purpose for which a search is undertaken, the Supreme

---

**15.** The fact that the searches discovered such items infrequently does not lessen the State's interest. With juveniles often brought to detention facilities on multiple occasions, many would become familiar with the searches, and the few instances of finding dangerous items may well indicate how effective the State's policy is as a deterrent.

**16.** The Policy states that its intention is "to control contraband and detect potential illicit activities." Despite the absence of detecting abuse in the Policy's statement of purposes and the disclaimer of such a purpose by the assistant supervisor at NHJDC, the Defendants contend on appeal that finding abuse is a purpose of strip searches, Br. of Appellees at 14, and not merely a helpful consequence. The State official responsible for promulgating the Policy testified that detecting abuse was one of its purposes.

Court has distinguished between a search of a particular individual and searches undertaken pursuant to a "general scheme without individualized suspicion." *Indianapolis v. Edmond,* 531 U.S. 32, 46, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000). A law enforcement officer's subjective purpose is irrelevant to the lawfulness of the search of a particular individual, *id.* at 45, 121 S.Ct. 447; *Whren v. United States,* 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), but is relevant to the validity of a general search policy, such as one implemented incident to a roadblock, *Edmond,* 531 U.S. at 45–46, 121 S.Ct. 447. As to the latter, a primary purpose "to advance the general interest in crime control," *id.* at 44 n. 1, 121 S.Ct. 447 (internal quotation marks omitted), will not suffice, *id.* at 44–48, 121 S.Ct. 447. Thus, searches incident to a road block set up for the primary purpose of apprehending drug law violators were held unreasonable, *see id.* at 48, 121 S.Ct. 447, while a primary public safety purpose of removing drunk drivers from the highways justified road blocks for sobriety checks, *see Michigan Department of State Police v. Sitz,* 496 U.S. 444, 450–55, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990).

In the pending case, the evidence establishes the State's primary non-law enforcement purposes—to protect the children from harm inflicted by themselves or other inmates, and to protect the safety of the institution. With these valid purposes established, we think the additional purpose of detecting abuse may be weighed in the reasonableness assessment, even if it was not subjectively entertained by state officials. Whether or not this justification alone would support a strip search, it permissibly adds to the combination of "special needs" that confront the State at a child's initial admission to a detention facility. Discovery of abuse is not precluded from contributing to the reasonableness of searches undertaken primarily to protect the safety of the person searched and the institution.

The detecting-abuse factor also encounters the ruling we have made that protects parents' rights to control the care and custody of their children by assuring that intrusive examinations of their children for evidence of abuse will not be undertaken without parental consent or judicial authorization. *See Tenenbaum v. Williams,* 193 F.3d 581, 597–99 (2d Cir.1999); *van Emrik v. Chemung County Department of Social Services,* 911 F.2d 863, 867 (2d Cir. 1990). However, those rulings concerned intrusions that "serve primarily an investigative function." *Id.* at 867. "The purpose was not to provide medical treatment to the child, but to provide investigative assistance to the caseworker." *Id.* Moreover, the intrusions at issue were x-rays, *id.* at 865, and medical examinations, *Tenenbaum,* 193 F.3d at 587. These rulings do not necessarily bar visual examinations for evidence of abuse undertaken by custodians responsible for developing and implementing an appropriate plan of care and treatment.

The facts of this case do not yield an obvious answer to the question whether it was constitutionally "reasonable" to perform strip searches upon S.C. and T.W. upon their initial admission to detention facilities. Assessing all of the circumstances—the risks to the psychological health of the children from performing the searches and the risks to their well-being and to institutional safety from not performing the searches, we conclude that the strip searches upon initial admission do not violate Fourth Amendment standards. However, since we do not reach the same conclusion with respect to repetitive searches undertaken after the children had been searched and remained in custody, absent any reasonable basis to think that they had acquired and secreted contraband

while in custody, we rule that the second, third, and fifth searches of S.C. and the second search of T.W. were unlawful. As to the sixth and seventh searches of S.C. (concerning a missing pencil), we will permit the parties on remand to amplify the record so that the District Court can make findings as to the existence of reasonable suspicion.

*Class action ruling.* The denial of class action certification was well within the District Court's discretion, for reasons set forth in Judge Dorsey's opinion.

### Conclusion

The judgment dismissing the action is vacated, and the case is remanded for further proceedings with respect to the sixth and seventh searches of S.C. and for determination of what relief, if any, is warranted as a result of our ruling that the second, third, and fifth searches of S.C. and the second search of T.W. were unlawful.

SOTOMAYOR, Circuit Judge, concurring in part and dissenting in part.

I concur with the majority's holding that the second, third, and fifth searches of S.C. and the second search of T.W. were unlawful. Absent an individualized basis to believe that the plaintiffs had acquired contraband while in custody of the authorities, these re-entry searches violated Fourth Amendment standards of reasonableness. With respect to the sixth and seventh searches of S.C., I concur with the majority's decision to remand to the district court to make factual findings as to the existence of reasonable suspicion. I also agree that the denial of class certification was well within the district court's discretion.

I dissent, however, from the Court's decision to uphold the first, fourth, and eighth strip searches of S.C. and the first strip search of T.W. Our caselaw consistently has recognized the severely intrusive nature of strip searches and has placed strict limits on their use. The concerns animating our prior rulings in this area should be only heightened when the privacy interests of emotionally troubled children are at stake. Here, the government has failed to demonstrate that its special needs should overcome these concerns and allow for strip searches, in the absence of individualized suspicion, of adolescents who have never been charged with a crime. Accordingly, I would find that, regardless of whether the suspicionless strip searches occurred upon entry or re-entry, they were unlawful.

I agree with the majority that the proper framework for analysis of the strip searches at issue is the "special needs" balancing test of *Board of Education v. Earls,* 536 U.S. 822, 829, 122 S.Ct. 2559, 153 L.Ed.2d 735 (2002), rather than the *Turner* standard for penal institutions, *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). The source of my disagreement with the majority lies in the application of the balancing test to the facts before us. In my view, the government has not demonstrated adequately that the highly invasive suspicionless strip searches bore a "close and substantial relationship to the government's special needs." *United States v. Lifshitz,* 369 F.3d 173, 186 (2d Cir.2004) (internal quotation marks omitted).

### A.

As the majority observes, strip searches—as compared to other kinds of searches—"instinctively give[ ] us the most pause." *Bell v. Wolfish,* 441 U.S. 520, 558, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). We have called a strip search "a highly intrusive invasion," *Rivera v. United States,* 928 F.2d 592, 607 (2d Cir.1991) (citation and internal quotation marks omitted), "an extreme intrusion upon personal privacy,"

*Burns v. Loranger,* 907 F.2d 233, 235 n. 6 (1st Cir.1990), and "an offense to the dignity of the individual," *id.* We hardly have been alone in this assessment. The Eleventh Circuit has accepted as "axiomatic that a strip search represents a serious intrusion upon personal rights." *Justice v. City of Peachtree City,* 961 F.2d 188, 192 (11th Cir.1992). The Seventh Circuit has referred to strip searches as "demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying degradation and submission." *Mary Beth G. v. City of Chicago,* 723 F.2d 1263, 1272 (7th Cir.1983) (citation and internal quotation marks omitted). Other courts have reached similar conclusions. *See Roe v. Texas Dep't of Protective & Regulatory Serv.,* 299 F.3d 395, 404, 405 & n. 11 (5th Cir.2002); *Roberts v. Rhode Island,* 239 F.3d 107, 110 (1st Cir. 2001); *Chapman v. Nichols,* 989 F.2d 393, 395–96 (10th Cir.1993); *Thompson v. City of Los Angeles,* 885 F.2d 1439, 1446 (9th Cir.1989); *Hunter v. Auger,* 672 F.2d 668, 674 (8th Cir.1982); *Doe v. Renfrow,* 631 F.2d 91, 92–93 (7th Cir.1980) (per curiam); *Flores v. Meese,* 681 F.Supp. 665, 667 (C.D.Cal.1988), *rev'd on other grounds, Reno v. Flores,* 507 U.S. 292, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993).

We should be especially wary of strip searches of children, since youth "is a time and condition of life when a person may be most susceptible to influence and to psychological damage." *Eddings v. Oklahoma,* 455 U.S. 104, 115, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); *see also Flores,* 681

F.Supp. at 667 ("Children are especially susceptible to possible traumas from strip searches."). When officials are dealing with children who may be victims of sexual abuse, the concerns are even greater. *See ante,* at 232 n. 10.

The case before us presents facts that provoke all of our typical concerns about strip searches. The detention facility officers on numerous occasions ordered appellants—troubled adolescent girls facing no criminal charges—to remove all of their clothes and underwear. The officials inspected the girls' naked bodies front and back, and had them lift their breasts and spread out folds of fat. The young girls described the process as embarrassing and humiliating. Indeed, T.W. cried throughout one of her searches. During one of S.C.'s searches, two other detainees were present. The juvenile detention facilities perform similar searches on every girl who enters,[1] notwithstanding the fact that many of them—indeed, most of them— have been victims of abuse or neglect, and may be more vulnerable mentally and emotionally than other youths their age.[2]

Given the uniquely invasive and upsetting nature of strip searches, it is not surprising that with the exception of the prison setting, *see Covino v. Patrissi,* 967 F.2d 73, 76–80 (2d Cir.1992), we have never found that a strip search in the absence of any individualized suspicion was reasonable. Even in the context of lawful detention and confinement, we have recognized

---

1. Since commencement of the suit, the strip search procedure has been altered to make it less intrusive. Detainees no longer are required to squat and cough, and they may wear a robe during the search, though the officials still inspect all parts of their body. The issue before us, however, is the reasonableness of the searches as they were conducted, not the reasonableness of the newly revised policy.

2. According to the defendants, ninety percent of the female juvenile detainees have suffered "some form of abuse or neglect," and sixty-two percent have screened positive for mental health conditions requiring further evaluation. Seventy-five percent have been diagnosed with "significant emotional difficulties."

constitutional limits on the state's authority to conduct strip searches—limits that the majority disregards in the present case. In *Weber v. Dell*, 804 F.2d 796, 804 (2d Cir.1986), we held that reasonable suspicion was required in order to strip search a defendant arrested and detained for misdemeanors. We reached this holding even assuming the correctness of a sheriff's assertion that seventy percent of such arrestees possessed contraband. *Id.* at 802 (finding that even if such a statistic were proven, it did not provide the particularized suspicion required by the Constitution to justify a strip search). Furthermore, in *Weber*, we did not state that a strip search of a felony arrestee, in the absence of individualized suspicion, would be lawful; rather, we suggested that, among other things, the nature of the offense for which the felony arrestee is detained furnishes the individualized suspicion required to justify the search. *Id.* We have applied and affirmed *Weber*'s restrictions on strip searches in numerous cases. *See Shain v. Ellison*, 273 F.3d 56, 62–66 (2d Cir.2001); *Wachtler v. County of Herkimer*, 35 F.3d 77, 81–82 (2d Cir.1994); *Walsh v. Franco*, 849 F.2d 66, 68–69 (2d Cir.1988). As the majority notes, all of the circuits considering the issue of strip searches of adults confined for minor offenses have reached the same conclusion. *See ante*, at 231–32.

In three other cases not discussed by the majority, we have likewise held that at least some individualized suspicion is necessary in order to justify a strip search, even where the government demonstrated a special need. *See Sec. & Law Enforcement Employees, Dist. Council 82 v. Carey*, 737 F.2d 187, 209–10 (2d Cir.1984); *M.M. v. Anker*, 607 F.2d 588, 589 (2d Cir.1979) (per curiam); *United States v. Asbury*, 586 F.2d 973, 975–77 (2d Cir. 1978).

*Anker* involved a strip search of a student conducted by a teacher. Our decision foreshadowed the advent of the special needs doctrine by recognizing, in the context of searches performed at schools, that school administrators are entitled to "greater flexibility" with regard to Fourth Amendment concerns because of the "unique relationship [teachers have] to their students, both in administering discipline as part of their educational function, and in protecting the well-being of all children in their care and custody." *Anker*, 607 F.2d at 589. Nevertheless, we held that "when a teacher conducts a highly intrusive invasion such as the strip search in this case, it is reasonable to require that probable cause be present." *Id.* Thus, even in a school setting where special needs permit some searches in the absence of probable cause, our caselaw only allows strip searches when there is probable cause.

In *Carey*, 737 F.2d at 192, the plaintiffs subjected to strip searches were corrections officers searched pursuant to a policy authorizing random, suspicionless searches for the purpose of detecting and deterring contraband smuggling. Although we acknowledged that the officers had a diminished expectation of privacy largely due to the nature of their work, *id.* at 202, and although we recognized the important governmental interest in "maintaining prison security and preserving internal order and discipline," *id.*, we nonetheless held that some individualized suspicion of possession of contraband was necessary to justify a strip search of the officers. *Id.* at 203–04.

Similarly, in *Asbury* we held that strip searches conducted at national borders must be premised on some measure of individualized suspicion and that "the suspicion should be substantial enough to make the search a reasonable exercise of authority." 586 F.2d at 975–76.

Although we recognized that the government's asserted special needs justified a relaxation of the probable cause standard in each of these cases, we nonetheless held that at least some individualized suspicion was needed to conduct a strip search.

The only exception to this principle that we thus far have recognized is an exception for prison inmates, *see Covino,* 967 F.2d at 76–80, which the plaintiffs—who have never faced any criminal charges—indisputably are not. Thus, to hold that the strip searches of the two girls in the instant appeal were reasonable is equivalent to saying that these girls are entitled to the same level of Fourth Amendment protection as prison inmates held on felony charges, and to decidedly less protection than people crossing the border, jail inmates detained on misdemeanor charges, prison corrections officers, or students in public school.

The majority opinion cites many cases upholding reasonable searches under the special needs doctrine, but none of these cases is remotely comparable to the case at hand, because—with the exception of cases in the prison context—none involved strip searches. *See Earls,* 536 U.S. at 838, 122 S.Ct. 2559 (upholding student drug tests); *Vernonia Sch. Dist. v. Acton,* 515 U.S. 646, 664–65, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) (same); *Nat'l Treasury Employees Union v. Von Raab,* 489 U.S. 656, 679, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989) (upholding employee drug tests); *Skinner v. Ry. Labor Executives' Ass'n,* 489 U.S. 602, 619, 634, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (same); *O'Connor v. Ortega,* 480 U.S. 709, 728–29, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987) (plurality opinion) (establishing a reasonableness standard, instead of a probable cause standard, for searches of public employees' personal papers); *New Jersey v. T.L.O.,* 469 U.S. 325, 347–48, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) (upholding a search of a high school student's purse). The majority suggests that one case, *Roe v. Marcotte,* 193 F.3d 72, 78 (2d Cir.1999), is "[e]specially pertinent," *ante* at 231, but that case is not pertinent at all, as it involved blood tests of convicted adult sex offenders held in prison. *See Roe,* 193 F.3d at 74. The nonprison cases relied upon by the majority involve, at their most intrusive, suspicionless drug testing of students or employees. In all of these cases, however, the person subjected to the drug test had *voluntarily* undertaken the job or activity that required testing. *See, e.g., Earls,* 536 U.S. at 831–32, 122 S.Ct. 2559 (finding that students voluntarily engaged in extracurricular activities). More importantly, the drug tests never required anything as "highly intrusive," *Rivera,* 928 F.2d at 607, as inspection by state officials of the plaintiff's naked body. The majority does not rely on *any* non-prison case upholding strip searches in the absence of particularized suspicion, because, of course, no such case exists.

While the majority overstates the relevance of the above-mentioned cases, it downplays the significance of the most closely analogous case it cites, *Justice v. City of Peachtree City,* 961 F.2d 188, 193 (11th Cir.1992). In *Justice,* the police detained two juveniles for loitering and truancy. At the police station, officers subjected one of them to a strip search. The Eleventh Circuit agreed with the defendants that "a detention center, police station, or jail holding cell is a place 'fraught with serious security dangers.'" *Id.* at 193 (quoting *Wolfish,* 441 U.S. at 559, 99 S.Ct. 1861). However, because strip searches were such a "serious intrusion upon personal rights," *id.* at 192, the court found that searches also had to be justified by the presence of individualized suspicion. *Id.* at 189 ("[L]aw enforcement officers may subject a juvenile who is lawfully in

custody to a strip search based upon reasonable suspicion that the juvenile is concealing a weapon or contraband."). The court explained: "We must determine whether the officers, based on the totality of the circumstances, had a particularized and objective basis for suspecting the particular person[ ] [searched] of criminal activity." *Id.* at 193 (alterations in original) (citation and internal quotation marks omitted); *see also id.* at 194 (considering six reasons reasonable individualized suspicion existed in that case). Though the instant case occurred outside of the law enforcement context, I would nevertheless follow the Eleventh Circuit's rationale and hold that reasonable suspicion must be present in order to strip search a juvenile who is not alleged to have committed a crime.

## B.

I turn next to the government's concerns assertedly motivating the searches and the efficacy of the searches in meeting those concerns. The majority argues that the government's special needs are even more compelling in the context of juvenile detention facilities than they are in cases involving public schools or correctional facilities. I agree. However, it is not enough for the government simply to assert a compelling special need. Our special needs jurisprudence generally has also required that the search "seek a minimum of intrusiveness coupled with maximal effectiveness so that the search[ ] bear[s] a close and substantial relationship to the government's special needs." *United States v. Lifshitz*, 369 F.3d 173, 186 (2d Cir.2004) (internal quotation marks omitted). This is not to say that the Fourth Amendment requires that only "least intrusive means" be used in order to effectuate the government's interests, but a "close and substantial relationship" between the intrusiveness and the need must

be demonstrated nevertheless. *Id.* at 184, 186 (citation and internal quotation marks omitted). The government bears the burden of demonstrating this nexus between the search and the asserted special need. *See Bell v. Manson*, 590 F.2d 1224, 1226 (2d Cir.1978).

The government here has completely failed to demonstrate that the invasive strip searches bore a "close and substantial" relationship to any governmental need. This first becomes clear upon examining the thirty-four "event reports" for the years 1995 through 2000 produced during discovery. The reports describe the occasions on which officers discovered contraband in the possession of the detainees. Of the thirty-four reports of contraband violations, thirty-two describe contraband that either (1) was discovered through a search that was less intrusive than a full strip search; (2) could have been discovered through a search that was less intrusive than a full strip search; or (3) could have been discovered through a policy that allowed strip searches only in cases of individualized suspicion. With regard to the remaining two reports, it is unclear whether a strip search was necessary for discovery of the contraband; it is also unclear if individualized suspicion existed. Thus, the detention centers' own documentation of contraband discoveries provides absolutely no evidence that suspicionless strip searches were necessary, or even helpful, in any case.

Other evidence in the record confirms the weakness of the government's arguments. One supervisor testified that of the one hundred strip searches she personally conducted, not one yielded evidence of contraband. A director of one of the facilities testified that out of 2,500 strip searches performed since that facility was built, only two strip searches revealed con-

traband that otherwise would not have been found. Those two recovered items of contraband were a piece of jewelry attached to a child's belly button and cocaine that was discovered in a child's clothing. Full nudity would not have been necessary to uncover these items.[3]

The majority accepts the government's argument that strip searches serve the "special need" of deterring children from smuggling contraband. I agree that, under certain circumstances, deterrence can be a legitimate special need that will justify some suspicionless searches. *See Von Raab*, 489 U.S. at 674, 675 n. 3, 109 S.Ct. 1384; *Wolfish*, 441 U.S. at 559, 99 S.Ct. 1861. However, the deterrence rationale is not very compelling in this case, particularly when balanced against the degree of the invasion of privacy. While deterrence may be an important rationale for employees who know they will undergo drug tests, *see Von Raab*, 489 U.S. at 674, 675 n. 3, 109 S.Ct. 1384, or for prisoners returning from contact visits with outsiders, *see Wolfish*, 441 U.S. at 559, 99 S.Ct. 1861, it has little applicability to a person who does not expect to be detained and subjected to a search. *See Hunt v. Polk County, Iowa*, 551 F.Supp. 339, 344 (S.D.Iowa 1982) (observing that even though a "ratio-

nale for upholding strip searches in [some] cases is that prisoners' awareness of the across-the-board policy will deter them from attempting to smuggle contraband when their next opportunity arises, ... [t]he deterrence rationale ... has little applicability to a person arrested unexpectedly on the street"); *see also John Does 1–100 v. Boyd*, 613 F.Supp. 1514, 1523 (D.Minn.1985) (finding that "arrest and confinement ... are wholly unplanned events, so that the defendants' strip search policy can hardly be expected to deter smuggling"). In Connecticut's juvenile detention centers, it is common for children to be arrested unexpectedly and confined immediately. Trial Tr. at 127–28. In other cases the juveniles are brought first to their parents, who then must bring them to court. Even in those cases, however, the child does not necessarily expect to be detained, as prosecutors do not seek to have the child detained in all cases.[4] *Id.* at 129. The deterrence rationale might make some sense for re-entry searches, given that the detention and the searches are foreseeable by the detainee in those circumstances; however, the majority concedes that re-entry strip searches are unlawful. In any case, even in the limited circumstances where the deterrence rationale could apply, the government has

---

**3.** The government's brief cites additional incidents of the discovery of contraband to justify the strip searches, but the facts surrounding those incidents do not demonstrate the necessity of full strip searches in the absence of individualized suspicion. For example, the government's brief discusses a girl with a history of self-mutilation who concealed a diaper pin in her bra. The government's brief fails to mention, however, that (1) the pin was not discovered during a strip search, and (2) a policy of allowing full strip searches only when based on individualized suspicion would have been sufficient to discover the diaper pin, given that officials had already learned of the girl's self-destructive tendencies by observing her arms and ankles.

**4.** In the case now before us, T.W. testified that she had not expected to be sent to detention even though she had been brought to court. As for S.C., her testimony does not suggest that she knew of the strip search policy before she arrived at the detention center for the first time; nor does the record clearly establish that she knew the police were coming to detain her on the first two occasions that they did so. (On the third occasion, she turned herself in.) Moreover, detention facility officials did not strip search S.C. after her single private visit with outsiders, even though that is precisely the sort of circumstance in which the deterrence rationale for strip searches would seem to apply with the most force.

made no showing that a full strip search—rather than other methods of searching—is necessary to achieve the desired deterrent effect.

The evidence regarding the efficacy of strip searches in detecting child abuse is even more scant than the evidence of contraband discovered during strip searches. The record contains over twenty-five reports of suspected abuse filled out by center employees. In each report, the employee is asked to "describe the circumstances in which the injury(ies), maltreatment or neglect came to be known to the reporter." Not a single report indicates that a full strip search was the source of the evidence of abuse. Moreover, while the majority opinion cites to evidence establishing a high rate of self-mutilation among detainees, I am not aware of any evidence in the record discussing the rate at which abuse is discovered during a strip search that otherwise would not have been discovered.

In criticizing the government's evidence, I again emphasize that the question is not whether the government's concerns justify a potentially-invasive search of some kind—such as a frisk search or a thorough search of all of a detainee's clothes and possessions—in the absence of individualized suspicion. Nor is the question whether the government's concerns justify a full strip search when there is some reasonable suspicion that a particular juvenile possesses contraband. The question instead is whether the government's concerns are sufficiently credible and sufficiently weighty to justify a highly degrading, intrusive strip search absent any individualized suspicion that the particular young adolescents ordered by the state to disrobe possess contraband. To that question, I would respond in the negative.

I would indicate, however, that the amount of individualized reasonable suspicion that would justify a strip search may be lower in these circumstances than in most contexts. It is my belief that, in most instances, the detention facilities would be able to conduct a strip search if the authorities first gathered information about the juvenile's medical or criminal history, questioned the juvenile about any history of abuse or suicide, and uncovered the circumstances surrounding his or her immediate detention. Such information, I believe, usually would provide the government with reasonable individualized suspicion to conduct the search.

Indeed, it is likely that in the case before us, the officers conducting the strip searches would have had a reasonable, individualized suspicion justifying the strip searches had they bothered to investigate the plaintiffs' personal histories and present circumstances. The appellees note that the plaintiffs were potentially suicidal, and that S.C. had been a "substantial user of narcotics." If the juvenile detention centers had performed the strip searches at issue based on reasonable, individualized suspicions rooted in the dangerous tendencies of the plaintiffs, I might not question their authority to do so. But this question is not before us. The district court made no findings as to what the officials knew or what information was available to them at the time of the search,[5] and the appellees do not argue to us that the searches were based on reasonable suspicion; their arguments on appeal are only that the searches were reasonable even in the absence of any individualized suspicion. We cannot employ hindsight to determine whether the searches at issue here were reasonable. If the information

5. The officers did ask limited questions before some of the searches, but the record reveals few details about the content of these questions. There is nothing to suggest that the questions played any role in the decision whether to conduct a strip search.

causing reasonable suspicion was unknown or irrelevant to the person performing the search, it is not part of our determination of "reasonableness" under the Fourth Amendment. *See Terry v. Ohio*, 392 U.S. 1, 21–22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) ("[I]t is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?") (internal citation omitted); *Beck v. Ohio*, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964) (holding seizure under Fourth Amendment reasonable if the facts known to the officer at the time of arrest would warrant the belief of a prudent person that the arrestee had committed or was committing a crime); *Weber*, 804 F.2d at 798 (refusing to entertain argument that reasonable suspicion existed to strip search the plaintiff, a misdemeanor arrestee, because, *inter alia*, defendants "concede that pursuant to jail policy a jail employee undertook a strip/body cavity search . . . in the absence of any ground other than her status as an arrested person").

It is too much of a departure from our prior cases and too great an extension of the special needs doctrine to say that any of the strip searches at issue here were justified absent individualized suspicion. Because I believe that the entry searches, like the re-entry searches, do not "fit within the closely guarded category of constitutionally permissible suspicionless searches," *Chandler v, Miller*, 520 U.S. 305, 309, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997), I respectfully dissent from the majority's finding that the first, fourth, and eighth strip searches of S.C. and the first strip search of T.W. were lawful.

